ROSENWASSER BROTHERS, INC., Plaintiff, *v.* HARRY PEPPER, as President of Local Union 72, United Shoe Workers of America, and Others, Defendants.

(Supreme Court, Queens Trial Term, October, 1918.)

Labor — means afforded by United States government to adjust differences between employer and employee in war industries.

Injunctions — provisions of — when granted — labor unions — contracts — arbitration — plaintiff granted injunction enjoining repetition of acts of violence which occurred during a strike.

   With means afforded by the United States government to adjust differences between employers and employees in war industries, a labor union has no right, for any cause whatever, to induce or incite workmen in such industries to strike or

not to work and thereby to jeopardize the successful outcome of our country's military operations in the present war and all that depends upon them even though so to do would have been lawful in times of peace.

Plaintiff, a manufacturer of shoes, employs about 2,500 workers, and eighty per cent of its business is with the United States government for which it is manufacturing shoes, leggings, gas masks and other equipment. Plaintiff's factory was and is conducted as an open shop and a strike among its employees instigated, aided and abetted by a labor union known as the " United Shoe Workers of America" was accompanied by violence, assaults and mass picketing. Prior to the strike the daily output of the factory was about 6,000 pairs of shoes and 15,000 pairs of leggings, besides other articles, all of which was shipped to government stations, and as a result of the dispute between plaintiff and said union the output of plaintiff's factory has been reduced to about one-fifth of its former production. In an action seeking injunctive relief against certain local and subordinate organizations of the union and certain of its officers and agents, it appeared that during the strike and for the purpose of preventing a stoppage of work on military equipment a contract in accord with the principles and policies of the United States for the settlement of labor disputes in war industries was entered into between plaintiff and the representatives of its employees, such action being the direct result of the mediation of the war department. It further appeared that plaintiff tried in good faith to carry out said contract and to settle by arbitration questions of wages and other matters in dispute, but that the individual defendants endeavored, notwithstanding the contract, to coerce plaintiff into a formal recognition of the union by inducing plaintiff's employees not to work and inciting them to insubordination, and the evidence as a whole discloses no legitimate reason or justification for the strike. *Held*, that plaintiff will be granted an injunction enjoining the repetition of acts of violence which occurred during the strike, the continuance of factory disorders which have been going on from the making of the contract to the end of the trial and strikes for any cause whatever during the present war.

The injunction, however, will provide that defendants may lawfully persuade plaintiff's employees to join the union, may demand of plaintiff anything they deem of advantage to said

employees or the union and may seek the attainment of their demands by application to the United States government or the government of the state of New York.

ACTION for a permanent injunction to enjoin acts of violence by certain labor unions, their officers and agents. Trial by court without a jury.

Max Meyer, for plaintiff.

Solomon S. Schwartz, for defendants.

SCUDDER, J.  A strike occurred in plaintiff's shoe factory on September 17, 1917, which was instigated, aided and abetted by a labor union known as the United Shoe Workers of America. Plaintiff thereupon brought an action seeking injunctive relief against certain local and subordinate organizations of the union and certain individuals who were officers, members or agents thereof. The strike was accompanied by violence, assaults and mass picketing.

The plaintiff is entitled to a permanent injunction restraining such actions. If this was all that there was to the case, no opinion would be necessary. There are, however, matters involved in this action which transcend the usual rights of the parties, and forbid its disposition upon cases and authorities involving disputes between capital and labor which arose before the war.

The following facts differentiate this case from the usual run of ante-bellum capital-labor cases.

The United States is a participant in this, the greatest war of all times. In the performance of its part it has been and is sending hundreds of thousands of men to Europe, who must be clothed and equipped. The president has called upon both manufacturers and workers to do their utmost in the way of supplying our forces with clothing and equipment.

Supreme Court, October, 1918.          [Vol. 104.

Plaintiff's factory is a large one, employing about 2,500 workers. Eighty per cent of its business is with the United States government for which it is manufacturing shoes, leggings, gas masks and other equipment.

Prior to the strike in plaintiff's factory about 6,000 pairs of shoes and 15,000 pairs of leggings, besides other articles, were being turned out daily and shipped to government stations.

The result of the dispute between the plaintiff and the union, which has been going on for almost a year and is still going on, is that the output of the factory has been reduced to about one-fifth of its former production.

It is well established by judicial decisions of this state rendered in cases which arose before the war that one employed for no definite period can quit work for no reason at all, and that such employee therefore has the right to threaten his employer that unless he adopts a business policy suggested or demanded by the employee the latter will terminate their relationship; and, basing their conclusions on these elementary rights of the individual employee, the same authorities further hold that it is permissible for an employee to urge other employees to quit work together, or to threaten their employer with such action unless their demands are granted, thus doing in combination what each might lawfully do himself. *Bossert* v. *Dhuy*, 221 N. Y. 342; *National Protective Assn.* v. *Cumming*, 170 id. 315; *Auburn Draying Co.* v. *Wardell*, 178 App. Div. 270, 274.

In other words, it seems established as the law of this state by decisions of the higher courts in cases which arose before the war, that a labor union may induce or persuade the employees of a manufactory

or other business, which is conducted by the owner thereof either as an open or a non-union shop, to become members of the union and to strike in order to compel the owner to conduct his factory or business as a union shop.

It seems to me that the principles announced in cases which arose before the war cannot be applied to the relation between workers and employers in war industries in so far as they conflict with the principles and policies of the United States government in the conduct of the war.

The production of war industries is so closely and immediately connected with actual military operations that it may be said to be a part of them. Can it then be that with means afforded by the government to adjust differences between employers and employees in war industries a labor union has the right, for any cause whatever, to induce or incite workmen in such industries to strike, or not to work, and thereby to jeopardize the successful outcome of our country's military operations, and all that depends upon them, even though so to do would have been lawful in times of peace? An answer other than no is unthinkable.

All the parties to the present controversy — the employer, the employees and the labor union — recognized that their respective rights and relations to each other were modified and controlled by their obligations and duties to the United States government. Their recognition of the principles and policies of the United States government in the matter of the control of war industries is shown by the evidence. The contract entered into between the plaintiff and the representatives of its employees in October, 1917, was the direct result of the mediation of the war department and the department's approval of the

contract, is shown by the signature thereto of the mediator for the department. This contract was in accord with the principles and policies of the United States for the settlement of labor disputes in war industries.

The principles and policies of the United States government which should be applied in the decision of this case have been recently set forth in a pamphlet issued by the national war labor board.

The portions thereof which are especially applicable to the case at bar are as follows:

" Principles and Policies to Govern Relations Between Workers and Employers in War Industries for the Duration of the War. ·

" *There should be no strikes or lockouts during the war.*

" *Right to organize.*

" The right of workers to organize in trade-unions and to bargain collectively through chosen representatives is recognized and affirmed. This right shall not be denied, abridged or interfered with by employers in any manner whatsoever. * * *

" Employers should not discharge workers for membership in trade-unions, nor for legitimate trade-union activities.

" The workers, in the exercise of their right to organize, shall not use coercive measures of any kind to induce persons to join their organizations, nor to induce employers to bargain or deal therewith.

" *Existing Conditions.*

" In establishments where the union shop exists the same shall continue, and the union standards as to wages, hours of labor, and other conditions of employment shall be maintained.

" In establishments where union and non-union men

and women work together, and the employer meets only with employees or representatives engaged in said establishments, the continuance of such conditions shall not be deemed a grievance. This declaration, however, is not intended in any manner to deny the right or discourage the practice of the formation of labor unions, or the joining of the same by the workers in said establishments, as guaranteed in the last paragraph, nor to prevent the War Labor Board from urging or any umpire from granting, under the machinery herein provided, improvement of their situation in the matter of wages, hours of labor, or other conditions as shall be found desirable from time to time.  *  *  *

" *Maximum Production.*

" The maximum production of all war industries should be maintained and methods of work and operation on the part of employers or workers which operate to delay or limit production, or which have a tendency to artificially increase the cost thereof, should be discouraged.  *  *  *

" *Custom of Localities.*

" In fixing wages, hours and conditions of labor, regard should always be had to the labor standards, wage scales and other conditions prevailing in localities affected.

" *The Living Wage.*

" 1. The right of all workers, including common laborers, to a living wage is hereby declared.

" 2. In fixing wages, minimum rates of pay shall be established which will insure the subsistence of the worker and his family in health and reasonable comfort."

, Subjoined to this statement of principles is set forth a method of presenting complaints and procedure.

It is unnecessary to quote it in full, but, in so far as it is relevant to this case, it may be stated that the method pointed out is that where there is a controversy between the employer and employees an adjustment board shall be formed composed of representatives of both parties, and, in case of their failure to agree, for the appointment of an arbitrator.

These principles laid down by the national war labor board have not the force or effect of a statute; and they are quoted only because they are a succinct declaration by the United States government of the principles which govern it in dealing with labor disputes arising in war industries.

From the very outset of the war it was patent to all that industrial peace was imperative if the war was to be prosecuted successfully, wherefore strikes and lockouts were and are discountenanced, and in cases of dispute the employer is called upon to bargain with the workers collectively, and, if an agreement is not reached, the dispute is settled by arbitration under the auspices of the war department. This procedure is necessary because it would be impracticable for the United States government to undertake the adjustment of disputes between every individual worker and his employer; therefore the government favors organization of labor unions to the end that there may be collective bargaining.

The case now being considered was on trial for several months and the testimony taken covers more than 5,000 typewritten pages. It is impracticable within the limits of an opinion to narrate the facts in detail, or to state anything further than a bare outline of the issues involved.

Several months prior to the strike in plaintiff's factory which occurred in September, 1917, one Old-

ham, the general organizer of the United Shoe Workers of America which had its headquarters in Boston, Mass., appointed the defendant Gilman an organizer for the union, and sent him on a mission to organize or bring into the union the workers in the shoe factories of Greater New York and vicinity. There were existent in Greater New York at the time when Gilman entered upon his campaign several local and subordinate organizations of the union, among them being the defendants Locals Nos. 72 and 96 and Joint Council No. 7. The defendant Haye was the business agent of these locals and joint council, and the officers and members co-operated with and followed the instructions of Gilman in his campaign. The inference is clear that power and authority to command their aid had been conferred upon Gilman. The defendant Haye seems to have been Gilman's principal assistant.

Plaintiff's factory was an open shop and one of the largest concerns in the district to which Gilman had been assigned. It is natural that Gilman's first efforts should be directed mainly against it. One Dow, an acquaintance of Haye, secured employment as a cutter in plaintiff's factory a few weeks before the trouble commenced. By secret means discontent was spread among plaintiff's workmen.

Dow, acting as leader of some malcontent cutters, arranged through Haye meetings between them and Gilman.

These meetings were addressed by Gilman and Haye. Gilman in his speeches told the men in substance that they should join the union and become members because they were working under very bad conditions in comparison with union factories, and that by joining the union they could fight for better

30

Supreme Court, October, 1918.          [Vol. 104.

conditions and be organized together; that it was a good time to be organized, and to ask for more money, because the plaintiff was working under government contracts, and would be compelled to give anything they wanted, that they could never get a better opportunity.

A.meeting took place on Monday night, August 27, 1917, at 162 Waverly avenue, Brooklyn, the Greater New York headquarters of the union. Substantially all of plaintiff's cutters and choppers attended this meeting. For the most part the men were Russian or .Polish Jews. Many of them could not speak the English language. Gilman assumed the role of an expert organizer with great experience and acted as the confidential adviser and director of this meeting. He procured the men to sign applications for membership in his union and to pay a fee of one dollar which was collected by business agent Haye. The cutters applied for membership in Local 72, and the employees in other departments of plaintiff's factory applied for membership in Local No. 96.

At Gilman's suggestion a committee was appointed to formulate a demand for increased pay to be presented to plaintiff. With the aid of Haye a price list was prepared covering all departments of plaintiff's factory. This price list was typewritten and in the English language. It was evidently intended to be a contract between the union and the plaintiff. It was headed with the names " The United Shoe Workers of America " and " Rosenwasser Bros.," and at the foot spaces were left for signatures as follows: " Signed for U. S. of A. Local 72 ........ " and " Signed by the firm ......... " · This paper, therefore, had a double aspect: it was not only a demand on plaintiff for increased pay for the men, but it was

also a demand for the recognition of the union by plaintiff.

It seems to me that there can be no doubt that Gilman and Haye caused the price list to be prepared in this form for the purpose of causing a breach between plaintiff and its employees. It was well known that plaintiff's factory had been conducted as an open shop, and that plaintiff's officers were opposed to its being conducted as a union shop. Gilman's dealings with plaintiff's operatives up to this point had been secret, and the demand for increased wages and recognition of the union when presented was a complete surprise to plaintiff's officers. The probabilities, therefore, that it would be rejected by them were evident.

Gilman was not an employee of plaintiff, nor did he have a wholly disinterested purpose to promote the interests of plaintiff's employees. His occupation was that of an organizer for the United Shoe Workers of America. He was planning and working to further the interests of the organization, or those in control of the organization, of that particular labor union. The interests of the organization would be promoted — to use terms of practical politics — if it could become " the dispenser of jobs," " the controller of the patronage " of plaintiff's large factory; in other words, Gilman's controlling purpose was to make plaintiff's factory a union shop in which no one could be employed unless he had a union card and in which no employee could be discharged without the consent of the union, or could remain at work unless he paid his dues and obeyed the rules of the union. It would be a long and tedious job to win the confidence and to induce by persuasion all or a majority of plaintiff's employees to join the union if it could be done at all in that manner; moreover, there would be danger of some

rival union entering the field. It would be more feasible and expeditious for Gilman to create a necessity for his leadership by inducing a strike. What occurred seems to accord with such a plan.

On the day following the day on which the price list for increased pay was presented to the officers of plaintiff the cutters were stopped at the door of the factory and told that they could not go to work except upon the old terms; and that as to any increase of pay plaintiff would deal with the men as individuals. The men thereupon refused to go to work. Gilman was reached on the telephone without difficulty, and shortly afterward, accompanied by Haye, met the men in the street in front of plaintiff's factory. Gilman and Haye sought a conference with plaintiff's officers, but were refused recognition, whereupon they led plaintiff's employees to a nearby hall where Gilman incited the men to strike by offering to help them if they did, and to give them all his time to assure the winning of the strike.

The men, acting on the advice of Gilman, Haye and other leaders of the union, organized a strike committee; a large number of the men picketed the factory. From the commencement of the strike until the obtaining of the preliminary injunction on or about September 20, 1917, the factory and vicinity thereof became the scene of disturbances, violence, coercion and intimidation. A number of the victims of these outrages were produced as witnesses and gave their testimony upon the trial. The complicity of defendants in these outrages is established by the evidence.

Attorneys were procured by defendants' aid to defend the pickets who were arrested for assaulting employees and otherwise disturbing the peace in the vicinity of the factory; a committee was appointed to

obtain bail so that persons arrested for these offenses might be liberated, and in at least one instance a striker who had been convicted of assault and sentenced to thirty days' imprisonment received his usual weekly wage from the strike funds during such term of imprisonment.

After the issuing of the preliminary injunction the disorderly conduct of the striking employees, at least in so far as mass picketing of plaintiff's factory was concerned, ceased.

That the principal purpose and intent of defendants in inciting the strike, and in aiding and abetting it, was to obtain a formal recognition by plaintiff of the union, so that the union organization could control employment in plaintiff's factory, rather than to advance the interests of the employees, by securing for them increased pay, shorter hours, and better conditions, is made clear by what took place at the negotiations for the settlement of the strike which were conducted under the auspices of members of the state board of arbitration. These negotiations began September 6, 1917, a few days after the commencement of the strike, and were continued for three or four days.

The plaintiff was represented by its president, Mr. Morris Rosenwasser. What he offered the men in the way of a settlement was both reasonable and just and fully in accord with the principles and policies of the United States government for adjustment of labor disputes in war industries. He recognized the right of his employees to collective bargaining by their chosen representatives, whether such representatives were or were not in plaintiff's employ, by admitting Gilman and Haye to the conference as representing the men; he agreed to the shorter hours demanded by the men; he offered an immediate temporary ten per cent

increase of wages, and the establishment of a permanent rate of wages by an adjustment board composed of representatives of both parties with provision in case of their failure to agree for the appointment of an arbitrator.

Gilman and Haye, however, took the position that the prices and working conditions were of secondary importance and could readily be adjusted if the plaintiff would recognize the union by entering into a contract with it. Gilman went through the form of submitting plaintiff's offer to the striking employees and subsequently reported at the conference that they had rejected it.

After the issuing of the temporary injunction on September 20, 1917, and perhaps in consequence thereof, plaintiff seemed in a fair way to replace the striking employees by others, and the striking employees became uneasy lest the strike should prove a failure. This probably was the inducing cause of the contract which was entered into between the plaintiff and the committee of the striking employees on October 5, 1917. In the making of this contract one William D. Thompson, a mediator appointed by the war department of the United States, participated. The provisions of the contract substantially conformed to the agreement offered by the plaintiff at the September conference and rejected by the men.

The October contract was not made with the union, but was signed by a committee representing the men. The defendant Gilman was the first member of the committee who signed. The contract also contained the following provision:

" The manufactory of the employer shall at all times be conducted as an open shop, and the employer shall be at liberty to engage employees regardless of

whether such employees are members of labor organizations or not, and no discrimination shall be exercised by the employer against any of the employees now out on strike, or against any employees by reason of his or her affiliation with the present union, or any other labor organization. Nothing herein contained is to affect the agreement to reinstate the striking employees as hereinabove provided. The employer shall not be required to discharge or dispense with the services of any of the present employees, but the employer is to take back all of the present striking employees as hereinabove provided."

Pursuant to the agreement plaintiff took back the striking employees. Both parties appointed representatives to act as a committee upon the adjustment of prices, as provided in the agreement. Gilman was one of the representatives appointed in behalf of the employees. Many prices were adjusted by the committee. Those prices which could not be adjusted were submitted to a board of arbitration consisting of one John Regan, a member of the state board of arbitration and the members of the adjusting committee. This board of arbitration likewise entered upon the discharge of its duties, and continued to act as such until and throughout the trial of this case.

The evidence shows that plaintiff in good faith tried to carry out the contract of October 5, 1917, and to settle by arbitration questions of wages and other matters in dispute. On the other hand, Gilman and his co-defendants did not act in good faith after the making of the October contract, but endeavored, notwithstanding that agreement, to coerce plaintiff into a formal recognition of the union by inducing plaintiff's employees not to work and inciting them to insubordination.

Almost daily from October 5, 1917, down through and to the conclusion of the trial of this action, the evidence shows some interruption of work in one department or another of plaintiff's factory. On the slightest pretext power was cut off, the men would stand up at their machines, have meetings in the factory during working hours, and create other disturbances. Furthermore, a number of union men would absent themselves for days at a time from one or another of the departments and then returning demand reinstatement. Due to their absence, the work of their department would fall behind, blocking work in other branches, with the result that many employees remained idle during working hours, yet entitled to receive pay though not working. One of the most pronounced incidents occurred toward the close of the trial. The production manager of plaintiff, one Moran, testified on or about March 12 and 13, 1918, he met one Epstein, a union leader among the employees, who said to him: "You can carry this news over to the court and also to your employers. I give you full authority to state that I am going to pull out the entire shop from cellar to roof, not just as many as we pulled out last time."

Apparently this threat was made good. Moran further testifies as to what occurred in plaintiff's factory a few days later as follows: "About 9 o'clock this morning one department, the cutting department, rose and there was a whistle from one of them, and all of them accumulated together on the floor; some ran to the back door, some to the front door, each took different directions going out; some ran upstairs, some down-stairs. I immediately telephoned the office what occurred, and they said to me to go to the upper floor in the fitting department, and they attended to the

other men on the various floors to see what was going on. I went immediately to the fitting department and saw many of the cutters. I saw some choppers, some of the legging operators from upstairs, and some from the basement down-stairs jerking each other and pulling the people from the machines, and so forth, and there was an awful noise there, asking everybody to get up from the machines to come out to the meeting and to have a strike. In the fitting department they pulled them all out. They took about fifteen men from the cutting department, about five from the chopping department, a few from the basement and a few from the leggings. Whenever there was anybody sitting at a machine somebody ran up and jerked him by the coat and said ' Hurry up; come out; you will get hurt if you don't come out.' There was a riot all over. All the goods were scattered all over the floor just like a fire; an uproar. This continued for about ten minutes until there was nobody left. I ran from one floor to the other and there was the same condition all over. The women screamed, they didn't know what was going on; many of them were new workers and when they heard the noise and yelling and whistling they screamed to beat the band.''

The complicity of defendants and other local organizations of the union in instigating, aiding and abetting these wrongful acts of plaintiff's employees is shown by the evidence. It also appears that Local Unions Nos. 110 and 61 of which plaintiff's employees were members acted in conjunction with the defendants. The evidence further shows that Gilman advised the union employees not to strike but to remain in the employment of plaintiff and not to work. This advice was malicious and wrongful in any view of the case. For an employee to remain in his employment and not

work is a breach of his contract with his employer. It is well established that it is illegal and wrongful for a trade union or any one else to instigate a breach of contract by employees, either singly or in a body.

Furthermore the actions of the defendants and the union employees of plaintiff subsequent to the October contract were done in bad faith. This contract was entered into for the purpose of preventing a stoppage of work on military equipment. Although the union was not formally a party to the contract, it nevertheless gained a substantial advantage by it in that it secured plaintiff's recognition of its officer, Gilman, as one of the representatives of the employees. By the contract the striking employees secured reinstatement in plaintiff's employment, shorter hours which they demanded, a temporary increase of pay, and the means to establish a just rate of pay by adjustment and arbitration. But while the adjustment committee and the arbitration board of which Gilman was the leading member were engaged in the performance of their duties, the union employees were creating disorder in plaintiff's factory, and Gilman and the other defendants were advising and encouraging their wrongful conduct.

It is elementary that a court of equity may restrain a trade union from inciting employees to violence, or the doing of any tortious acts in the conduct of a strike, or to breach their contract of employment. There is no question but that plaintiff is entitled to an injunction within these rules. The question of greatest importance, however, is whether under the facts presented here the court should not go further and enjoin defendants from inciting, aiding and abetting strikes of plaintiff's employees for any cause, in view of the fact that the parties to this controversy have

devised and have set in motion appropriate machinery to settle by arbitration all differences existing between them, and because the life of our nation is dependent upon an uninterrupted production of those things needed to successfully carry on the war in which our country is engaged.

It seems to me that an injunction should be granted on these grounds.

The usual reciprocal rights and obligations of employer and employee are modified in these times by their respective duty to the United States government. Duty to the government was in contemplation of the parties in entering into the contract of employment, and they dealt with each other with reference to that duty. The prosecution of the war by the United States government requires the maximum production of military equipment in the shortest time. To that end it only asks organized labor to forego the enforcement of its purposes by strikes or curtailment of production in war industries. The government does not oppose the organization of labor or the formation of trades unions, but favors them. It has announced that this right shall not be denied, abridged or interfered with by employers in any manner whatsoever. It has not only recognized this right, but has used its power and influence to compel employers to recognize it.

In this case the employer has recognized the right of its employees to collective bargaining by their chosen representatives; it has granted them the shorter hours which they demanded; it has agreed to arbitrate the question of wages. The wages which plaintiff is paying pending the determination of the arbitrators is at least a living wage and as high, if not higher, than is paid in other factories. Nevertheless, in view of the great increase in the cost of living,

Supreme Court, October, 1918.    [Vol. 104.

it seems probable that wages should be further raised; this is a question to be determined by the arbitrators. The plaintiff's factory is a modern building, and the evidence fails to show any good ground of complaint as to its hygienic conditions; in fact no such claim is made. The evidence shows no legitimate reason, or justification in the circumstances for a strike. For defendants to incite the employees to strike merely for the purpose of promoting the private organization interests of the union is, under the circumstances, wicked.

The theory of the action is that the defendant local organization of the union and the individual defendants, together with others who have not been made parties defendant, have conspired and continued to conspire to coerce plaintiff to recognize the union and to conduct its factory as a union shop by inciting a large number of plaintiff's employees and others to commit certain illegal and wrongful acts which have caused and will cause irreparable injury to plaintiff's business, four-fifths of which is war work for the United States government.

At the trial plaintiff limited its claim for relief to an injunction only, and it does not seek to recover damages.

An injunction should be granted substantially as follows:

(1) The repetition of acts of violence which occurred during the strike in September, 1917, to be enjoined;

(2) The continuance of factory disorders which have been going on from October fifth, to the end of the trial, to be enjoined;

(3) Strikes for any cause whatever to be enjoined for the duration of the war.

The injunction, however, to provide that defendants may lawfully persuade plaintiff's employees to join the union, may demand of plaintiff anything they deem of advantage to the employees or the union, and may seek the attainment of their demands by application to the United States government, or the government of the state of New York.

Decision signed, settle judgment on notice in accordance therewith.

Judgment accordingly.