AUBURN DRAYING COMPANY, Respondent, *v.* WILLIAM
WARDELL, Individually and as Business Agent and Secre-
tary of Local Union, No. 679, of the International Brother-
hood of Teamsters, Chauffeurs, Stablemen and Helpers of
America, etc., and Others, Appellants.

Fourth Department, May 23, 1917.

**Labor unions — strikes and boycotts — respective rights of employer
and employees — motive — combination and conspiracy to wrong-
fully injure business of another — evidence justifying injunction
and assessment of damages.**

Suit in equity brought against the business agent and members of a local
labor organization of teamsters, etc., to obtain a permanent injunction
restraining acts alleged to amount to a boycott upon the plaintiff's truck-
ing business, and to recover resulting damages. It appeared that before
the alleged wrongful acts of the defendant the plaintiff had conducted a
large and lucrative business; that on the organization of the local union
efforts to induce the plaintiff's employees to join the same were largely
unsuccessful, as well as efforts to induce the plaintiff to bring his employees
into the organization. As a result of rancor and ill-feeling aroused between
the plaintiff and the defendants, the latter adopted a resolution declaring
the plaintiff to be " unfair," which resolution was approved by other
labor organizations of the locality which sustained the attitude of the
defendants. There followed a systematic campaign among the customers
of the plaintiff by which strikes were threatened if they continued busi-
ness relations with the plaintiff, and as a result many persons who had
previously done business with the plaintiff ceased to do so, whereby the
plaintiff's business was in a large part destroyed. It further appeared
that upon the granting of the injunction by the trial court many of
these persons resumed business relationships with the plaintiff. On all
the evidence, *held*, that a decree granting the permanent injunction, with
$1,000 damages for injuries already sustained, should be affirmed.

The respective rights of employer and employees rests upon the right of
individuals freely to contract, which right is guaranteed to each by our
Constitution. The employees are free to contract for the disposal of
their services and the employer may employ whom he will.

In the absence of contract to the contrary, either employer or employee
may terminate the employment at will with or without reason for such
action.

Moreover, the employee has a right to threaten to terminate the employ-
ment with or without reason, such threat being a threat to do only what
he may lawfully do. The employer has the equal and coextensive right
to threaten to discharge.

Moreover, striking employees may lawfully importune customers and business associates of the employer to cease business dealings with him, in other words, induce a boycott.

But such methods cannot be used in the furtherance of an unlawful or malicious purpose, that is to say, the right of boycott cannot be made an engine of oppression for oppression's sake only. Hence, in determining the rights of parties, motive is important, for if the primary purpose of such boycott be punishment, revenge or injury, then the possible good to labor conditions cannot be made a cloak to shield the actors from the consequences of acts done in furtherance of the unlawful purpose.

*Held further,* that the acts of the defendants were contrary to subdivisions 5 and 6 of section 580 of the Penal Law, prohibiting conspiracies to prevent another from exercising a lawful trade or calling and acts injurious to public trade or commerce.

Subdivision 6 aforesaid is not inapplicable on the theory that the business conducted by the plaintiff could be as well done by other persons, so that public trade will not be injured, when in fact it appears that before the boycott the plaintiff was doing the major portion of that work in the locality.

As the boycott successfully put the plaintiff out of business and removed one of the competitors, it tended to disrupt and obstruct the free flow of commodities and chattels.

Irrespective of the statutes, by the common law it is unlawful to combine for the purpose of destroying the business of another.

The intent of the defendants is a question of fact for the trial court, and may be established by circumstantial evidence.

KRUSE, P. J., and MERRELL, J., dissented, in memorandum.

APPEAL by the defendants, William Wardell and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Cayuga on the 3d day of November, 1915, upon the decision of the court after a trial before the court without a jury, with notice of an intention to bring up for review an interlocutory judgment entered in said clerk's office on the 29th day of March, 1915.

*Frederick A. Mohr,* for the appellants.

*George B. Turner* and *John Taber* [*Walter Gordon Merritt* of counsel], for the respondent.

LAMBERT, J.:

The action is equitable in form, seeking permanent injunction, prohibiting acts of the defendants claimed to be in furtherance of what is generally described as boycott, together with money damages. The trial court first determined the

Fourth Department, May, 1917.     [Vol. 178.

right of the plaintiff to injunctive relief. Then, pursuant to a stipulated practice, interlocutory judgment was entered and further hearing had to ascertain the amount of money damages to be awarded. The plaintiff has succeeded in obtaining the permanent injunction sought and has been awarded $1,000 for injuries already sustained. The appeal is from both judgments.

Plaintiff is engaged in a trucking business in the city of Auburn, and at the time of the events complained of had a large and lucrative business. Its patronage was largely made up of customers who usually employed that concern in and about the hauling and trucking of their various commodities. The service rendered was satisfactory and the proportion of the business of that character done by the plaintiff in said city was large.

So far as appears, the plaintiff had succeeded in maintaining harmonious relations with its employees, some thirty to forty-five in number. And until the events complained of in this action there does not appear to have been any general policy maintained in connection with such business either for or against the organization of such employees into associations generally described as labor unions. About November, 1912, representatives of organized labor began an agitation looking to the organization of a so-called teamsters' union in said city of Auburn. Effort was made to persuade plaintiff's employees to join that union. This effort was largely unsuccessful although in a few instances the men did join. Effort was then made by such representatives to secure the aid of the plaintiff itself in bringing such men into the organization. That effort also failed. Apparently growing out of and connected with these failures there began a feeling of rancor, somewhat mutual, between the representatives of the labor organization and the officials of the plaintiff. This feeling has given rise to charges and counter charges of harsh and unreasonable conduct upon the part of each.

Following such failures the Teamsters' Union, in July, 1913, adopted a resolution declaring the plaintiff to be "unfair." Two other concerns were declared in such resolution as unfair. But they do not seem to have been prominent in the future events in this controversy.

Following the adoption of this resolution of unfairness, the Central Labor Union, an association designed to bring together all labor organizations in the city, next took action. It attempted to negotiate with the plaintiff and, failing therein, it formally approved the declaration of "unfairness" on the part of plaintiff. Similar action was then taken by many of the other local labor organizations. All of these sustained the attitude of the Teamsters' Union and the Central Labor Union toward the plaintiff. Then there seems to have begun a systematic campaign among the customers of the plaintiff. They were notified that plaintiff was on the unfair list and their various employees gave notice that if such customers continued business relations with the plaintiff strikes would be called against them respectively. Contractors who had theretofore engaged plaintiff to haul their building material supplies were compelled to withdraw from such contractual arrangements. And in one instance where one such contractor already had a portion of his material hauled to his job by the plaintiff, he, in order to satisfy the demands of the labor organization, was compelled to haul it back to the station and then again draw it to the job by a teamster belonging to the union. This incident, perhaps, will illustrate the force of the suggestions made to the various employers by their employees. Butchers were notified that their meat cutters would quit work if the beef to be cut was hauled upon plaintiff's trucks. Bakers and merchants were likewise notified. This propaganda continued and with the result that the business theretofore enjoyed by the plaintiff was in a large part destroyed.

It is also significant that in a number of instances these business relationships, thus terminated, were at once resumed upon the granting of the injunction in this case. The conclusion is well justified that the cessation of business dealings with the plaintiff, by its various customers, was not voluntary upon their part but was induced and brought about through fear of financial loss if they persisted in ignoring the various demands of the labor organizations.

The solution of controversies such as this, whether arising between employer and employee, between rival employees or

organizations of employees, or between rival employers or organizations of such, all proceed from the common conception of the right of the individual to freely contract for disposal of his services or his goods and the individual right of the employer to employ whom he will. This is a right guaranteed to each by our Constitution and thoroughly engrafted upon our republican form of government. (*People v. Marcus,* 185 N. Y. 258; *Park & Sons Co. v. Nat. Druggists' Assn.,* 175 id. 1.) Invariably in these disputes each party to the controversy bases his attack or defense upon the standard of right and justice. The general correctness of the principle invoked must be conceded; its application is, however, frequently obscured.

Judicial decisions in the many instances which have arisen have definitely settled certain of the involved questions. There is no longer doubt but that both employer and employee have the utmost freedom of contract with relation to the hiring by the one and the working by the other. In the absence of contract to the contrary, either may terminate the employment at will, and with or without reason for such action. It is equally well settled that the employee has a right to threaten to terminate the employment with or without reason, such threat being a threat to do only what he may lawfully do. This right in the employee is balanced and sustained by the equal and coextensive right in the employer to threaten to discharge. This opens the door for the employee to say to his employer that unless he adopts a business policy suggested or even demanded by the employee, then that the employee will terminate the relationship. (*National Protective Association v. Cumming,* 170 N. Y. 315.) And as a necessary adjunct to such right it is determined by the same authority that this right in the individual permits him to urge another or others to a like course of action and thus to do in combination with others what he might lawfully do himself, *i. e.,* to strike and to urge others to strike and all with or without reason. And he may threaten, in conjunction with others, and for insufficient or even no reason, to terminate the relationship between the employer and members of his employees.

These rights to act in community and to threaten to so

act, approved as they are by great judicial authority, may amount to instruments of oppression in unscrupulous hands. The right thus guaranteed to the employee may not be of great consequence when confined to the individual while it becomes a great and fearsome power against the employer when participated in by a large portion, if not all, of his employees. The insistence upon the legal right to terminate the employment, backed by force of numbers and careful organization, no doubt frequently becomes a threat of financial annihilation, as much or more effective in securing acquiescence in demands than would be a threat of physical violence. However this may be, the above doctrine is thoroughly engrafted in a long line of judicial decisions and this court may not depart therefrom.

The rights of the employee in the termination of his employment, thus settled, have been likewise extended to his right to importune customers and business associates of the employer to cease business dealings with the employer. It is said that no man needs a reason for terminating all business relations with another, and that the assignment of an insufficient reason does not affect the right to so terminate such relationships. (*Gill Engraving Co.* v. *Doerr,* 214 Fed. Rep. 111.) This opens the door for the employee to accompany such importunities to customers and business associates with the announced intention upon the part of the employees of the latter to terminate their employment and to strike unless such customers and business associates observe the demands made.

The latter plan of action is what is known generally as a boycott. It looks to the disruption of the business connections, means of trade and livelihood of the employer, through threatened attack upon the business of such customers and business associates. Such a course of conduct has frequently received the sanction of our courts as being predicated upon certain definite and well-recognized legal and constitutional rights in the employee. (*Park & Sons Co.* v. *Nat. Druggists' Assn.,* 175 N. Y. 40; *Mills* v. *United States Printing Co.,* 99 App. Div. 611.)

The various judicial holdings to the above effect have produced a situation where both sides to these controversies

invariably insist that the result pro or con, is an invasion of legal rights. This has become so marked that it has been written that situations may and do arise in these controversies where each party asserts only constitutional and equal rights so that there is a clash of such rights. Under such circumstances it is said that equity is powerless to grant relief and that the damage ensuing is without redress. (*Gill Engraving Co. v. Doerr, supra.*)

But running throughout all the decisions upon these questions there is to be found a common thread in which is found the test which solves the rights of the parties. This common idea is that the powers and rights declared to rest in individuals or combinations of individuals, although lawful in and of themselves, are not to be used in furtherance of an unlawful or malicious purpose. In other words, the great right cannot be made an engine of oppression, for oppression's sake only. This conception first gained its foothold in this State under the case of *Curran v. Galen* (152 N. Y. 33). That decision arose upon a demurrer. The complaint charged the combination and the use of claimed rights for a malicious purpose. In discussing this aspect of malice, that court said: " Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper, or to restrict, that freedom, and, through contracts or arrangements with employers, to coerce other workingmen to become members of the organization and to come under its rules and conditions, under the penalty of the loss of their position, and of deprivation of employment, then that purpose seems clearly unlawful and militates against the spirit of our government and the nature of our institutions. The effectuation of such a purpose would conflict with that principle of public policy which prohibits monopolies and exclusive privileges. It would tend to deprive the public of the services of men in useful employments and capacities. It would, to use the language of Mr. Justice BARRETT in *People ex rel. Gill v. Smith* (5 N. Y. Cr. Rep. at p. 513), ' impoverish and crush a citizen for no reason connected in the slightest degree with the advancement of wages, or the maintenance of the rate.'

" Every citizen is deeply interested in the strict maintenance of the constitutional right freely to pursue a lawful avocation, under conditions equal as to all, and to enjoy the fruits of his labor, without the imposition of any conditions not required for the general welfare of the community. The candid mind should shrink from the results of the operation of the principle contended for here; for there would certainly be a compulsion, or a fettering, of the individual, glaringly at variance with that freedom in the pursuit of happiness, which is believed to be guaranteed to all by the provisions of the fundamental law of the State. The sympathies, or the fellow-feeling which, as a social principle, underlies the association of workingmen for their common benefits, are not consistent with a purpose to oppress the individual who prefers by single effort to gain his livelihood. If organization of workingmen is in line with good government, it is because it is intended as a legitimate instrumentality to promote the common good of its members. If it militates against the general public interest, if its powers are directed towards the repression of individual freedom, upon what principle shall it be justified? "

The necessity for such a rule is obvious although perhaps best seen by illustration from extreme cases. Thus, the right to strike and to threaten to strike are lawful in and of themselves. Yet if a representative of organized labor should so far prostitute his powers as to demand of the employer the payment of tribute to him personally as a condition for not calling a strike, I assume no court would long hesitate in reaching the conclusion that the attempted use of such means for such a purpose would be unlawful. By such illustration it is not intended to suggest its presence in this case. The illustration is used solely to accentuate the necessity for the observance of the rule that lawful powers become unlawful when used as instruments of oppression and destruction of lawful rights.

The rule enunciated in *Curran* v. *Galen* does not seem to have been departed from in this State. It was not heartily approved in *National Protective Association* v. *Cumming* (*supra*), but it was followed by that authority. Attempted application of the rule has seemed frequently to make the

Fourth Department, May, 1917.        [Vol. 178.

rights of litigants to depend upon distinctions more or less fanciful and to shroud the solution of these questions in uncertainty. Yet I anticipate that such result is brought about, not by any defect in the rule itself, but through confusion in applying the rule to the facts in the various cases.

Thus it is easily determined that a boycott or strike predicated upon violence, induced through misrepresentations, or violative of contractual rights, presents unlawful features. The lawfulness of the combination and all its effects are not so easily determined when, as here, there has been no violence or threat of it, no misrepresentation and no violation of contract for employment.

It is thus seen at the outset of inquiry it is first to be determined what motive actuated such conduct. And this inquiry itself brings confusion. There are many adjudicated cases holding that labor organizations have the right to strike and to boycott in furtherance of a purpose of general good and benefit to themselves (such as shorter hours and more pay or better working conditions). Nor does the incident of private injury necessarily attendant upon execution of such general plan render unlawful the general scheme. It seems to be conceded, however, that if the primary purpose be one of punishment, revenge or injury then the general argument of good to labor conditions cannot be made a cloak to shield the actors from the consequences of acts done in furtherance of the unlawful purpose.

I take it that the purpose, motive or intent referred to in this line of cases is the one immediately in hand. Probably no dispute of this character ever arose, not open to the argument that whatever was done was so done in the furtherance of some one's conception of what would be for the general good of organized labor. If such general argument, always available, is allowed to control, then the distinction ceases to be valuable or important and the courts might as well hold that in none of these cases is there redress. Such distinction seems to be intended by the writers of these various opinions and there seems to be always presented the primary inquiry of the real immediate object sought. If that object be one commendable then the scheme is not unlawful although

involving private injury. If it be unlawful it may not be shielded behind general arguments of real or fancied good to organized labor.

In the case at bar the trial court has found upon ample evidence that the primary purpose sought by the defendants was the injury and destruction of plaintiff's business, and that although perhaps open to the suggestion that there was an ultimate hope of benefit to organized labor, the immediate business in hand was to injure the plaintiff. If these facts are well grounded in this record, then we have no further difficulty for such a purpose is unlawful at common law whether or not it offends any particular statute. Such a purpose cannot be justified by argument that each particular step in the transaction was lawful in and of itself.

In determining whether the intent actuating the members of the combination was legal or otherwise, we have the aid of various statutory enactments. If the acts complained of in fact violate some express statutory provision, then clearly that may be prohibited and at the suit of a private suitor. (*Kellogg* v. *Sowerby*, 190 N. Y. 370; *Rourke* v. *Elk Drug Co.*, 75 App. Div. 145.) In this connection attention is directed to section 580 of the Penal Law which provides by subdivisions 5 and 6 as follows:

" If two or more persons conspire:   *   *   *

" 5. To prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation, or by interfering or threatening to interfere with tools, implements, or property belonging to or used by another, or with the use or employment thereof; or,

" 6. To commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws,

" Each of them is guilty of a misdemeanor."

It would seem that the acts found by the trial court do offend subdivision 5 of the above section 580 of the Penal Law in that they were designed to prevent the plaintiff from exercising a lawful trade or calling by threats of interference with property belonging to it. Such a conception requires that the word " property " in this instance shall be construed

to include the good will and patronage of the plaintiff. For such conclusion there is judicial authority. (*People* v. *Davis*, 159 App. Div. 464; *Newton Co.* v. *Erickson*, 70 Misc. Rep. 291; affd., without opinion, 144 App. Div. 939.)

The application of subdivision 6 of section 580 is not so clear. By this subdivision it is prohibited, however, to conspire to commit any act injurious to trade or commerce. It is argued by appellants that this section can have no force upon the facts here involved for the reason that it is not proven that the carting and draying previously done by the plaintiff was not and could not be as well done by some one else. This argument is answered by the fact found that at the time of the acts complained of the plaintiff was doing the major portion of that work in the city of Auburn. The executed purpose of the combination was directed to putting the plaintiff out of business. It had substantially accomplished its purpose. This removed one of the many competitors in that line of business. It necessarily tended to disrupt and obstruct the free flow of commodities and chattels. Injury to trade and commerce was the direct result of the executed purpose of the combination and being the direct result, the consequence must be presumed to have been intended.

But besides and beyond this statute to combine for the purpose of the destruction of another's business is unlawful at common law and such seems to have been the uniform holding of our courts from the time of *Curran* v. *Galen* (*supra*) and we, therefore, return to the consideration of the evidences of such a purpose to be found in this record.

The intent and object of this combination were properly handled by the trial court as a question of fact. Intent is always a fact. It deals with the mental operations of the conspirators. Such mental conception is usually, as here, susceptible of proof only circumstantially. Men's motives and objects are judged by their overt acts, purpose invariably preceding each act. These findings of intent, then, are to be sustained upon the entire record in the case, if at all.

It appears that the subject of controversy involved in this case was not primarily one of wages. The object sought and resisted was the recognition of organized labor and its employment by plaintiff. Upon failure of the defendants to enlist

the men generally and their further failure to procure the support and interest of the plaintiff itself, these defendants then sought to force the result they had been unable to procure otherwise. Their first step was to list the plaintiff as unfair. In the parlance of labor organizations this meant simply non-recognition of and failure to employ organized labor as such. Unfortunately the term is not always understood by others than the labor combinations. Various organizations only remotely related were induced to lend their support and to enforce their moral support, with demand upon their various employers. Each of such employers had recognized organized labor. Such were required to desist from all business dealings with the plaintiff. And, urged by the great labor organizations and the combination of the various unions, such a demand was substantially a threat. To resist it meant serious financial loss and disruption of business. The various employers adopted the expected course, actuated by self-interest, and such had no primary interest in the dispute between the parties to this litigation. Their acquiescence was unwilling and forced. The intent as evidenced by these acts was to deprive the plaintiff of all patronage unless it yielded to the demands of these organizations. That such was the purpose and that it looked to the complete destruction of plaintiff's business, if necessary, to bring about that result, cannot be gainsaid upon this record. It is no answer to say that such a course of conduct might ultimately result in benefit to organized labor through bringing within its dominion all of this class of business. Such a remote and ultimate hope does not hide the primary purpose of the destruction of property rights. I deem the findings in this respect to be well grounded, and I, therefore, conclude that the trial court properly disposed of this question of fact and reached a result well sustained by this record.

Such a destructive purpose renders unlawful the entire combination and, despite some judicial expressions to the contrary, the time has not yet come when the courts of this State are powerless to interfere and preserve constitutional and property rights thus assailed. In fact, failure or laxity of the courts in this respect must and can work only injury both to the employer of labor and to organized labor itself.

The judgment appealed from should be affirmed, with costs.

All concurred, except KRUSE, P. J., and MERRELL, J., who dissented in a memorandum by KRUSE, P. J.

KRUSE, P. J. (dissenting):

The controversy between the parties is whether the work of teaming, which the plaintiff has to do, shall be done by union labor or non-union labor. The plaintiff contends that it favored the open shop policy, willing to treat union and non-union labor alike and with equal fairness, while the defendants contend that the plaintiff in fact discriminated against and was unfair to union labor. The defendant the Central Labor Union is the central body with which the other defendant labor unions, including the teamsters' local union, are connected. After the organization of the Teamsters' Union a representative of the Central Labor Union and the president of the local Teamsters' Union tried to persuade the president of the plaintiff to aid them in having the plaintiff's teamsters join the local Teamsters' Union, but the suggestion did not meet with favor, though he professed to be neutral. He was president of the Citizens League, which was an organization in the interest of the employers, and none too friendly to organized labor.

Upon the refusal of the plaintiff to assist them to have its work done by union labor the plaintiff was placed upon the unfair list. That means, according to the findings of the trial court, an employer who refuses to treat with the labor organizations, refuses to employ union labor, and refuses to give to his employees the conditions asked for by labor organizations with respect to hours of labor, shop conditions and other similar working conditions.

The judgment undertakes to relieve the plaintiff from the effect of placing it upon the unfair list by enjoining the defendants from enforcing rules or orders which require their members to quit the service of employers who patronize the plaintiff.

The decision seems to rest upon the proposition that there was an unlawful combination and conspiracy (1) to prevent the plaintiff from carrying on its business by threats and

intimidation; and (2) to commit acts injurious to trade and commerce.

None of the defendants had any ill will toward the plaintiff or the teamsters in its employ. Their sole and only purpose in placing the plaintiff upon the unfair list was to have the plaintiff's teaming work done by union labor. Neither was there any force or violence used to accomplish that purpose. I think it clearly appears that the primary purpose of the defendants was not the destruction of the plaintiff's business, but the resulting injury was a mere incident in accomplishing a lawful purpose. The destruction of plaintiff's business would harm rather than benefit the defendants. There would be one less business enterprise requiring labor.

The trial court finds that the ultimate hope of the defendant was to better the conditions of the members of the union, by bringing into its organization all of the craftsmen and laborers in Auburn, so that their united efforts for higher wages, shorter hours and better working conditions might be more persuasive and effectual, and that without such motive or ultimate purpose the boycott would not have been inaugurated. This purpose is quite in accord with the declarations of principles and the constitutions and by-laws of the various defendant labor organizations. They declare it to be the duty of every laboring man to use his utmost endeavors to secure the amelioration of the laboring classes generally, and to that end unite the various trades and labor organizations of the city so as to form one brotherhood for the defense of the rights and protection of the interests of the laboring masses. They favor the rigid enforcement of all existing beneficial labor laws, especially those requiring compulsory education and the abolition of the truck system, favor arbitration and the use of every honorable means to adjust difficulties which may arise between workmen and employers, and to labor assiduously for the development of a plan of action that may be beneficial to both parties.

If the purpose of this combination was simply to carry out these declared principles and purposes, I think the combination was not illegal, although what was done had the effect to injure the plaintiff's business. Employees, as well as employers, are injured every day in their trade and employ-

ment by their competitors, and if the means are not unlawful they are without legal redress. It should be borne in mind that this action is not to redress any grievance or enforce any right of either the plaintiff's teamsters or the plaintiff's customers, and the question is not whether the plaintiff has been or will be injured, but whether the injury is the result of an illegal combination and unlawful acts.

While these organizations, outside of the central organization, are composed of different classes of laborers, they are in fact associated together as one body in a common purpose for their own betterment. To accomplish this purpose I think they had the right to say to the employers: If you employ the plaintiff, who refuses to recognize us and give our members employment, we will refuse to work for you.

Much has been said and written upon the subject of boycott. The word itself is comparatively new, but the practice is as old as human history. It has been used frequently and effectively in all sorts of controversies, both by individuals and nations. The decisions of the courts are by no means in accord upon the question, and to collate them and enter into a long discussion of them would serve no useful purpose. This diversity of opinion exists in nearly every State of the Union, as well as in the Federal courts.

I content myself by citing but one decision, that of the Court of Appeals of this State (*National Protective Assn.* v. *Cumming*, 170 N. Y. 315). The question was there elaborately discussed by three of the judges. While they were not in accord, nearly all, if not every member, agreed to certain principles laid down in that decision. I forbear to quote at length from the opinions, but all the judges agreed to the proposition that workingmen have the right to organize to secure higher wages, shorter hours of labor, and to better their conditions generally. They have the right to strike and to cease work in order to secure any lawful benefit to the members of the organization, and they have the right to do all these things as a body and by prearrangement, provided the object is not to gratify malice or inflict injury upon others.

I think the doctrine of that decision requires the reversal of this judgment. If the purpose of placing the plaintiff upon the unfair list had been merely to injure the plaintiff,

and the request to employ union teamsters a mere pretext, the action of the defendant was unjustified and illegal. But if it was to obtain the work for the defendant's members they acted within their legal rights, although it had the effect of displacing others, and to injure the plaintiff's business.

I think that judgment should be reversed and the complaint dismissed.

MERRELL, J., concurred.

Judgment affirmed, with costs.