CHARLES R. FALCIGLIA, Doing Business under the Style and Trade Name of LEHIGH ORNAMENTAL PLASTERING Co., Plaintiff, *v.* JOHN GALLAGHER, as President of the OPERATIVE PLASTERERS' AND CEMENT FINISHERS' INTERNATIONAL ASSOCIATION, LOCAL No. 60, GREATER NEW YORK EMPLOYING PLASTERERS' ASSOCIATION, INC., and ARTHUR RHODES, as President and Managing Director, and Another, as Treasurer of the NEW YORK PLASTERING CODE COMMITTEE, Defendants.

Supreme Court, Special Term, Bronx County, November 16, 1937.

*Sidney O. Raphael,* for the plaintiff.

*Wolf & Kohn,* for the Contracting Plasterers, etc.

*John F. Kent,* for the Operative Plasterers' and Cement Finishers' International Association, Local No. 60.

*Joseph F. Valente,* for the Greater New York Employing Plasterers' Association, Inc.

*William P. Thomas,* for the New York Plastering Code Committee.

Koch, J. This is an application for a temporary injunction pursuant to the provisions of article 51 of the Civil Practice Act. The plaintiff, a plastering contractor, has instituted an action seeking as relief, among other things, various permanent injunctions and also damages against the defendants John Gallagher, as president of the Operative Plasterers' and Cement Finishers' International Association, Local No. 60, Greater New York Employing Plasterers' Association, Inc., and Arthur Rhodes, as president and managing director, and " John Doe," the party intended being the treasurer, of the New York Plastering Code Committee. A hearing has been held pursuant to section 876-a of the Civil Practice Act.

On or about April 7, 1937, an agreement was entered into between Contracting Plasterers' Association of Greater New York and

defendant Greater New York Employing Plasterers' Association, Inc., which associations are employers' associations composed of contracting plasterers in the city of New York, as one set of parties, and Operative Plasterers' and Cement Finishers' International Association, Local No. 60, a union of workmen employed in the plastering industry in the city of New York, as the other party. The purpose of the agreement, as stated therein, was for stabilizing wages and working conditions in the plastering industry and insuring the payment of wages provided for in the agreement. The agreement contained various provisions which were stated to be for the mutual benefit of the members of the contracting parties and provided that any person, firm or corporation engaged in the contracting plastering industry as an employer might become a party to the agreement in the manner therein provided.

The agreement, in article 5 thereof, provided for the execution by all of its signers of a voluntary code of fair competition in the form which was annexed thereto. The code referred to in the agreement, and to which each party thereto was thereby bound to subscribe, required each plastering contractor who anticipated obtaining a plastering contract from an owner or builder, upon being invited to submit an estimate on a job, to notify the managing director of the code of his intention to submit a bid. It further provided that the administrative committee of the code should establish a bid depository for the filing of copies of bids, and that each contractor should within twenty-four hours after submission of a bid, file a true copy of the bid and all revisions thereof with the bid depository. The bids were then to be opened by the managing director. Certain provisions follow as to what each bid must contain, the alleged purpose of which is to insure that each bid will be large enough to pay union wages to the men employed on the job.

The plaintiff contends that he signed the agreement and became entitled to become a member of the code and enjoy the benefits of the agreement and the code. There is a conflict in the evidence as to whether or not the plaintiff actually signed the agreement and the code, but, in any event, the court finds as a fact that the plaintiff signed the agreement.

The plaintiff proved that he had obtained a plastering contract from Terf Construction Corporation, and, in accordance with the agreement and the code, attempted to register the contract and obtain the certificate referred to in the code, and that the code committee, or the industrial board thereof, rejected his application, and that no reason was given for the rejection.

Article 7, subdivision (n), of such code provides: " At the time of paying the fee in full or the required one-third thereof, a *registration certificate* will be issued and the same is to be posted in a conspicuous place on the job."

Plaintiff testified: " Q. What did you say to him [Rhodes, president of the code committee] and what did he say to you? A. He says, ' The Industrial Board has rejected your application.' ' For what reason ' I asked him. ' No reason.' ' But there must be a reason,' I said. He says, ' They simply wont give it to you.' " This testimony is uncontradicted.

The plaintiff thereafter testified that he attempted to get men from the union to perform his contract, but his requests were denied for the sole reason that he had no certificate and that he was, therefore, unable to get men. This was confirmed by John E. Gallagher, one of the defendants, who testified that he was president and business agent of the union, and knew the plaintiff was endeavoring to get men from his local. He further testified: " Q. What did you tell him? A. He asked for men. I says ' You have no certificate according to the code and agreement.' Q. How do you know that Mr. Falciglia did not have a certificate? A. Every certificate that is issued by the code is sent to me and I in turn put it in my office. Q. And without a certificate, would you not give Mr. Falciglia men? A. No. Q. Did you give Mr. Falciglia any men? A. No." And, further: " Q. And if that Code Committee refuses to issue a code certificate on the job, can that contractor get any men from your union? A. No."

The above and other evidence clearly establishes that, although the agreement did not by its express terms obligate the union to supply workmen only to those contractors certified by the code committee, yet the manner in which the parties acted under the agreement in effect gave to the code committee power to establish a virtual monopoly of the plastering business and to boycott any plastering contractor at its whim or caprice. The testimony established that if a plastering contractor could not get a certificate from the code committee he could not get union men. It also established that his only alternative was to hire non-union men, in which event all union men on the job would strike and the building could not be completed.

As further evidence of the effect of the combination and arrangement of which the plaintiff complains, the testimony shows that the builder, with whom plaintiff contracted, was compelled to abandon his contract with the plaintiff, to execute a release to the defendant union, and to enter into a new contract with a different plasterer, incidentally, but perhaps significantly, a relative of the

president of one of the associations, and at a price $7,000 in excess of the plaintiff's contract.

The defendants attempt to avoid the legal consequences of their combination and arrangement by explaining its alleged virtues and intended purposes, and by disavowing any intention to boycott the plaintiff. Their further explanation that the plaintiff or any other plastering contractor could at any time get union men so long as he accepted men of the union's selection is wholly inadequate and unavailing. The fact remains that this plaintiff was absolutely refused union men. No matter how laudable may have been the expressed purposes of the combination, there is no doubt that in this case it has been used as the instrument of oppression. The public will be the ultimate sufferers if such practice is permitted or condoned.

I am not unmindful of the decision in the case of *American Fur Manufacturers Assn., Inc.,* v. *Associated Fur Coat & Trimming Manufacturers, Inc.* (161 Misc. 246; affd., 251 App. Div. 708), but in my opinion the facts there should be distinguished from the instant case. There the plaintiff alleged in his complaint that his only alternative was to make independent contracts with the labor unions for union men to be furnished. That contract did not deprive the plaintiff from making a livelihood. In the case at bar, the union's refusal to furnish plaintiff with union men unless he first obtained a code certificate, which apparently it was impossible for him to obtain, would effectually prevent his making a livelihood. Furthermore, the members of the association in the *American Fur Manufacturers Assn.* case were not wholly denied union labor by the contract and combination between defendant association and the unions. They were merely denied certain benefits given by the unions to members of defendant's association. A contract to give members of one group special privileges denied others is quite different from a contract and arrangement whereby representatives of plastering contractors and representatives of a labor union combine in an alleged code committee and exercise arbitrary power to give or withold union labor.

Whatever the Legislature may have done or attempted in respect to the exemption of *bona fide* labor unions from the operation of section 340 of the General Business Law, the court cannot conceive that there was any intention to exempt them except in respect to the pursuit of *bona fide* labor activities. Surely there was no intention to give immunity and sanctity to union activities designed not to further the ends of labor but to advance the monopolistic aims of employer groups in their efforts to stifle competition, and, furthermore, the Legislature would be without power to enact such legislation.

This court regards as sound and controlling the reasoning of the Appellate Division of this Department in *Grassi Contracting Co.* v. *Bennett* (174 App. Div. 244), where the court, in a unanimous opinion (at p. 250), said: " but where a labor organization calls or threatens to call a strike of its members, not *primarily* for the lawful benefit or advantage of the union, or of its members, but for an *unlawful* purpose, that is, one prohibited by law, or which contravenes public policy, to the injury of another or others, then its action or threatened action, if consummated, will render it liable in damages (*Curran* v. *Galen*, 152 N. Y. 133; *Jacobs* v. *Cohen, supra; Purvis* v. *United Brotherhood*, 214 Penn. St. 348) and if not consummated, may be enjoined." And also the reasoning of the same court in *Brescia Const. Co.* v. *Stone Masons Contractors' Assn.* (195 App. Div. 647), where in language peculiarly applicable to the instant case, GREENBAUM, J., writing for a unanimous court, said (at p. 654): " The defendant unions, in acting as the tools or instrumentalities of the Contractors' Association for meting out punishment to the plaintiff corporation, thus also became wrongdoers. As has been observed, the labor unions had no grievance of their own against the plaintiff and yet they carried out the behest of the Contractors' Association to ruin the lawful occupation of the plaintiff. The acts of the combined associations were malicious, wanton interferences with the right of the plaintiff, which contravened the provisions of section 580 of the Penal Law, which declares that ' If two or more persons conspire: * * * 5. to prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation, * * * Each of them is guilty of a misdemeanor.' "

In *Auburn Draying Co.* v. *Wardell* (178 App. Div. 270; affd., 227 N. Y. 1) the court, after reviewing the authorities, said (at pp. 276 *et seq.*): " But running throughout all the decisions upon these questions there is to be found a common thread in which is found the test which solves the rights of the parties. This common idea is that the powers and rights declared to rest in individuals or combinations of individuals, although lawful in and of themselves, are not to be used in furtherance of an unlawful or malicious purpose. In other words, the great right cannot be made an engine of oppression, for oppression's sake only. This conception first gained its foothold in this State under the case of *Curran* v. *Galen* (152 N. Y. 33) * * *. The rule enunciated in *Curran* v. *Galen* does not seem to have been departed from in this State * * *. It is thus seen at the outset of inquiry it is first to be determined what motive actuated such conduct. * * * It seems to be conceded, however, that if the primary purpose be one of punish-

ment, revenge or injury then the general argument of good to labor conditions cannot be made a cloak to shield the actors from the consequences of acts done in furtherance of the unlawful purpose." The court further said (at p. 279) that the trial court had " found * * * that the primary purpose sought by the defendants was the injury and destruction of plaintiff's business, and that although perhaps open to the suggestion that there was an ultimate hope of benefit to organized labor, the immediate business in hand was to injure the plaintiff. If these facts are well grounded in this record, then we have no further difficulty for such a purpose is unlawful at common law whether or not it offends any particular statute. Such a purpose cannot be justified by argument that each particular step in the transaction was lawful in and of itself * * * attention is directed to section 580 of the Penal Law * * *. It would seem that the acts found by the trial court do offend subdivision 5 of the above section 580 * * *. But besides and beyond this statute to combine for the purpose of the destruction of another's business is unlawful at common law and such seems to have been the uniform holding of our courts from the time of *Curran* v. *Galen* (*supra*) * * *. Such a destructive purpose renders unlawful the entire combination and, despite some judicial expressions to the contrary, the time has not yet come when the courts of this State are powerless to interfere and preserve constitutional and property rights thus assailed. In fact, failure or laxity of the courts in this respect must and can work only injury both to the employer of labor and to organized labor itself."

To countenance the activities and practices here involved would give sanction to the transformation of labor unions from media for the advancement of the welfare of the working classes to convenient instruments to be used in circumventing the law.

The fact that legislatures and courts have recently extended much sympathy and encouragement to the laboring classes in their attempts to better their conditions, has not been overlooked in reaching the conclusions herein, but when the kindly cloak of protection is used to cover arrogance and disrespect for lawful restrictions existing for the benefit of all, it is time to call a halt and draw a line beyond which there may be no lawful advance. Though such a line may not be arbitrarily drawn, it must, however, if all classes of society are to be equally protected under the law, be drawn short of such conduct as has been here established.

The motion is accordingly granted.

Submit findings under section 876-a and order enjoining *pendente lite* all appearing defendants from

1. Interfering with the plaintiff in the performance of any lawful contract obtained by him;

2. Preventing the plaintiff from obtaining and employing union men in the performance of any lawful contract obtained by him;

3. Threatening plaintiff, or any person with whom he may contract, with any statement, act or conduct to the effect that plaintiff cannot obtain union men.

The court will entertain suggestions of counsel as to the amount of the required bond.