REINFORCE, INC., et al., Appellants, v. HUGH BIRNEY, as President of Local No. 46 N. Y. of the Wood, Wire & Metal Lathers' International Union, et al., Respondents.

Argued October 4, 1954; decided December 31, 1954.

*Albert A. DuPont, Thomas D. Austin* and *Stephen J. Masse* for appellants. I. Defendant union is not immune from liability for the intentional destruction of plaintiffs' business from motives of revenge unrelated to any lawful labor objective. (*Dorchy* v. *Kansas,* 272 U. S. 306; *Auburn Draying Co.* v. *Wardell,* 178 App. Div. 270, 227 N. Y. 1; *Curran* v. *Galen,* 152 N. Y. 33; *National Protective Assn.* v. *Cumming,* 170 N. Y. 315; *Falciglia* v. *Gallagher,* 164 Misc. 838; *People* v. *Gassman,* 295 N. Y. 254; *Opera on Tour, Inc.,* v. *Weber,* 285 N. Y. 348; *Ameri-*

can Guild of Musical Artists v. Petrillo, 286 N. Y. 226; Nash v. Mennan, 279 App. Div. 609, 303 N. Y. 956; Rochette & Parzini Corp. v. Campo, 301 N. Y. 228; Hunt v. Crumboch, 325 U. S. 821.) II. The damages awarded by the jury are in conformance with the proof and represent only fair compensation for the injury sustained. (Alexander's Dept. Stores v. Ohrbach, 269 App. Div. 321.)

Harold Stern and George Rosling for respondents. I. Defendant union, a bona fide labor organization, is not liable for refusal of its members to work for plaintiffs. (National Protective Assn. v. Cumming, 170 N. Y. 315; Rochette & Parzini Corp. v. Campo, 301 N. Y. 228; Opera on Tour, Inc., v. Weber, 285 N. Y. 348; Nash v. Mennan, 279 App. Div. 609, 303 N. Y. 956; Hunt v. Crumboch, 325 U. S. 821.) II. Inasmuch as defendant union is an unincorporated association sued through its president, this action is not maintainable unless the individual liability of every member is established. (Schouten v. Alpine, 215 N. Y. 225; Browne v. Hibbets, 290 N. Y. 459; Glauber v. Patof, 294 N. Y. 583.) III. No actionable wrong has been established with respect to the defendants Dillon and Spillane. (Greyhound Corp. v. Commercial Cas. Ins. Co., 259 App. Div. 317; Downtown Harvard Lunch Club v. Racso, 199 Misc. 618; Nathanson v. Brown & Williamson Tobacco Corp., 189 Misc. 1024.) IV. The damages awarded are excessive and not sustained by the proof. (Cramer v. Grand Rapids Show Case Co., 223 N. Y. 63; Witherbee v. Meyer, 155 N. Y. 446; Broadway Photoplay Co. v. World Film Corp., 225 N. Y. 104; Dunkel v. McDonald, 272 App. Div. 267, 298 N. Y. 586; Gombert v. New York Central & H. R. R. R. Co., 195 N. Y. 273.)

DESMOND, J. Plaintiffs (Reinforce, Inc., a corporation organized to carry on a lathing business, and Foley, its principal officer and owner) were awarded money damages by a jury, on their complaint that defendant union and its members had maliciously conspired to prevent plaintiffs from carrying on their business and had put an end to such business operations by causing some of the union members to quit their employment with plaintiffs, and by causing all the union's members to refuse to work for plaintiffs. The Appellate Division reversed plaintiffs' judgment on the law, and dismissed the complaint for

failure of proof. The members of that court were not, however, in full agreement as to the applicable law. The Trial Justice had charged the jury that its task was to determine whether defendants' acts had been motivated by malice, or by a desire to improve employment conditions, and had instructed the jurors that, if the motivation was malicious, plaintiffs would be entitled to their damages. The majority Justices in the Appellate Division took the view that since the union members " had the absolute right to refuse to work for the plaintiffs, for any reason or for no reason at all ", malice was immaterial. The Presiding Justice, however, coming to the same result (reversal and dismissal) by a different route, did not agree that the element of malice was immaterial. Defendants' acts, he pointed out, were concerted and so, if prompted by malice alone, would cast defendants in damages. But the evidence here, as he saw it, was insufficient to show that malice was the only spur to the union's activity, or that damage to plaintiffs was the union's sole purpose. We agree with the Presiding Justice's analysis of the proof and with his statement of the law.

Plaintiff Foley was for many years a construction worker and member of the operating engineers union. After attending law school and being admitted to the Bar, he again took up construction work and in 1937 became president of one of the locals of his union. While so acting as a union representative, he, in 1940, 1945 and 1946, had three serious disagreements with the representatives of defendant union. The first of those controversies had to do with a complaint by defendants' officers that plaintiff Foley was siding with a contractor who, according to defendants, was violating a certain building contract, to defendants' disadvantage, by installing fewer steel rods than were called for in the specifications. In the second, or 1945, dispute, Foley lined up on the side of certain contractors and against defendant union, which was resisting efforts of the contractors to eliminate double pay for Saturday work. The third difference of opinion came in 1946, when, after a Federal board had authorized a seven-hour day in the construction industry, defendant union tried to obtain an agreement whereby its members would get eight hours pay for seven hours work, but the contractors (and Foley) insisted that the regular workday remain at eight hours.

. Later in 1946, Foley resigned as his union's president and became a labor relations consultant. Again, trouble broke out between Foley and defendants' officers, who blamed him for grievances which defendant union had suffered at the hands of a contractors' organization with which Foley was associated.

In 1948, Foley organized the plaintiff corporation to go into the lathing business as a so-called " lumper ", that is, one whose contracts require it to supply labor only on construction work, the general contractor furnishing the materials. Foley had never done lathing work, or operated as a " lumper " previously. On behalf of plaintiff Reinforce, he consulted one of defendants' principal officers, Matthews, who recommended one of the union members for the job of Reinforce's superintendent. Foley, for Reinforce, then signed a lathing contract on an apartment house job, and got some workers for it (between ten and thirty men, at various times) from defendant union. No contract, however, was ever made by the union, with either plaintiff. Late in 1948, Reinforce obtained several more lathing jobs. However, after a union hearing at which Foley appeared and at which there was some discussion of the old grievances, defendant union notified plaintiffs that Reinfoce had been denied approval as a contractor to which defendant union would supply men, and that, after the next payroll date, no members of the union would work for plaintiff Reinforce. None of the members ever did work for Reinforce thereafter, and so, since defendants' members included all the metal lathers in the vicinity, Reinforce was out of business. The union sent to Reinforce's general contractors some letters informing them of the union action, and we will mention those letters again, at another place in this opinion. All the above facts, including the recurring difficulties between Foley and the union, were undisputed at the trial.

The Trial Justice submitted to the jury questions of fact as to whether Foley was " anti-union " or " guilty of anti-union acts ". In another part of his instructions he told the jurors that it was for them to decide whether defendants' purpose was to further the proper aims of union labor or whether their motive was vengeful and spiteful. Finally, he told them that if they should conclude that defendants had acted maliciously and without cause or justification, damages might be awarded to

plaintiff. The charge does not say in so many words (although perhaps it is sufficiently suggested) that if the motives were found to be mixed — good and bad — defendants must win the case, provided their acts had some reasonable relation to wages, hours of employment, collective bargaining or some other valid union objective. But, whether or not the charge was adequate, the complaint was, in our opinion, properly dismissed by the Appellate Division, because plaintiffs did not carry their burden of showing that defendants' acts were solely "malicious", that is, that they were done "without legal or social justification" (*Campbell* v. *Gates,* 236 N. Y. 457, 460).

Just as (when there is no binding contract) an employer may hire, or refuse to hire, at will, so may a worker or a group of workers refuse, or quit, employment for any reason or no reason (*Opera on Tour, Inc.,* v. *Weber,* 285 N. Y. 348, 353; *Hunt* v. *Cromboch,* 325 U. S. 821, 825). But when men quit work in concert, they offend against the law if their sole and unmixed motive or purpose is to injure an employer (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin,* 245 N. Y. 260, 262; see GRAY, J., in *National Protective Assn.* v. *Cumming,* 170 N. Y. 315, 334; *Bossert* v. *Dhuy,* 221 N. Y. 342, 359; *Williams* v. *Quill,* 277 N. Y. 1; see *Dorchy* v. *Kansas,* 272 U. S. 306, 311). But, if the acts of unions "have any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment or for the protection from labor abuses, then the acts are justified" (*Opera on Tour, Inc.,* v. *Weber, supra,* p. 355). The result is not changed by the fact that the work stoppage or refusal injures an employer. Such harm, although intentionally done, is actionable only if not justified (*Lough* v. *Outerbridge,* 143 N. Y. 271, 283; *Grombach Productions, Inc.,* v. *Waring,* 293 N. Y. 609, and cases cited; *Aikens* v. *Wisconsin,* 195 U. S. 194, 204). If the doers, by means not in themselves unlawful, of acts not in themselves unlawful, have any proper purpose to serve, they are not liable for the damage they cause (*Peabody, Jr., & Co.,* v. *Travelers Ins. Co.,* 240 N. Y. 511, 519; *Al Raschid* v. *News Syndicate Co.,* 265 N. Y. 1). Unions, as well as everyone else, may claim the benefit of the settled rule that "the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and

exclusively directed to injury and damage of another " (*Beardsley* v. *Kilmer,* 236 N. Y. 80, 90, citing *American Bank & Trust Co.* v. *Federal Reserve Bank,* 256 U. S. 350, 358, for the epigrammatic phrase: " disinterested malevolence "; and see *Park & Sons Co.* v. *National Wholesale Druggists' Assn.,* 175 N. Y. 1; *Rosenau* v. *Empire Circuit Co.,* 131 App. Div. 429, 436). The *Beardsley* decision rejects the idea that the motive is immaterial if the act be lawful, since a concurring opinion to that effect, in *Beardsley,* represented the view of one Judge only.

The modern application, to controversies between unions and employers, of these rules, is illustrated by *Rochette & Parzini Corp.* v. *Campo* (301 N. Y. 228). There, the defendant union, whose members were the only ones available in the metropolitan New York area for certain kinds of stone work, decided not to supply labor to any subcontractors, and so put plaintiff, a subcontractor for such work, out of business. Just as in the present case, the question in *Rochette* was not as to the fairness, propriety or necessity of such a determination by the union. In the absence of proof that the motivation was entirely malicious, plaintiff had no remedy at law. In the *Rochette* situation, the union withdrew its members from an employment because the union thought it to its interest so to do. In each case it was impossible, on the record, to find that the sole motivation was " malicious ", hence, there was no basis for a judgment against the union.

In *Rochette & Parzini Corp.* v. *Campo* (*supra*), there was another question, too, and some support was found there for a finding of illegal union activity by the union in sending, to other unions, letters coercing those unions not to work for plaintiff, and in sending letters to contractors describing plaintiff as " non-union ", etc. However, the letters sent by the defendant union in the present case were in no way unlawful since they merely gave simple notification that " Reinforce, Inc. has not ɒeen approved by Local Union 46 as one of the lathing contractors to whom it will furnish union members ", and that, " Effective as of the next payroll date no members of Local Union 46 will accept employment with, or continue in the employ of, Reinforce, Inc."

The judgment should be affirmed, with costs.

VAN VOORHIS, J. (dissenting). Plaintiff Reinforce, Inc., is engaged in the building trades, organized to conduct a lathing business. This is a branch of industry in which closed or union shop conditions prevail. This entrepreneur must hire its employees from among the members of defendant's union or cease to do business. It is willing to sign a labor contract with defendant union, providing for wages, hours and working conditions on a parity with other contractors in the same industry. Nevertheless defendant union refuses to enter into such a contract, or to permit its members to work for this contractor due to the circumstance that plaintiff, Thomas Foley, president and owner of Reinforce, Inc., was formerly president of one of the union locals, but fell into disfavor for the reason that he afterwards became a labor relations consultant, and took the employers' side in negotiations with unions for various clients in labor disputes. Now, as above stated, Foley has become a contractor himself, owning and managing Reinforce, Inc.

It is true that individual workers, whether union members or not, have the right to refrain from working for this contractor or for any employer for any reason. They may do so in combination where the purpose serves some legitimate labor objective (*National Protective Assn.* v. *Cumming,* 170 N. Y. 315; *Opera on Tour, Inc.,* v. *Weber,* 285 N. Y. 348). The law recognizes a difference between quitting work or refusing to work as individuals and doing so by concerted action (*Opera on Tour, Inc.,* v. *Weber, supra*). What may lawfully be done by an individual separately cannot always be done through acting in combination with others. Here, as it seems to me, defendant unions have no more right to enter into a combination to destroy the business of plaintiff for the reason that they disapprove his having become a contractor, or that as a labor consultant he favored contractors in collective bargaining negotiations, than the union in *Opera on Tour, Inc.,* v. *Weber* had to combine to destroy an enterprise for the reason that it produced music by machinery instead of through live musicians. This court pointed out (p. 353) that the vice in *Opera on Tour, Inc.,* v. *Weber* was that this was done " even though the members of the Stagehands' Union were not dissatisfied with respect to wages, hours or terms and conditions of their employment, and no controversy existed or exists between them and plaintiff."

Where closed or union shop conditions prevail in an industry, such a concentration of power in the union management carries with it responsibilities which the union owes to the industry and to society. This is made very clear in the opinion in *Jacobs v. Cohen* (183 N. Y. 207, 212–214) which established the legality of labor contracts providing for the closed shop, where it discusses *Curran* v. *Galen* (152 N. Y. 33) pointing out that *National Protective Assn.* v. *Cumming* (170 N. Y. 315, *supra*) " in nowise overruled *Curran* v. *Galen* ", and that the latter decision " stands unaffected as an authority." Unless this power is employed to further some lawful labor union purpose, the union loses its status as exempt from the laws against monopoly or combination in restraint of trade. Thus section 20 of the Clayton Act (U. S. Code, tit. 29, § 52) protects against injunction in Federal cases " involving, or growing out of a dispute concerning terms or conditions of employment ". A corresponding protection is contained or implied in subdivisions 3 and 4 of section 340 of the New York State General Business Law and section 580 of the Penal Law, and the limitation to legitimate labor purposes is upheld and well understood under the Federal Norris-LaGuardia Act (U. S. Code, tit. 29, §§ 101–115) and its New York State counterpart, section 876-a of the Civil Practice Act. (*Opera on Tour, Inc.,* v. *Weber,* 285 N. Y. 348, *supra; American Guild* of *Musical Artists* v. *Petrillo,* 286 N. Y. 226; *Nash* v. *Mennan,* 279 App. Div. 609, affd. 303 N. Y. 956; *Falciglia* v. *Gallagher,* 164 Misc. 838; cf. *People* v. *Gassman,* 295 N. Y. 254, 259). It may be doubted that *Hunt* v. *Crumboch* (325 U. S. 821) any longer represents Federal public policy, in view of its having been overruled by section 303 (subd. [a], par. [1]) of the Labor Management Relations Act of 1947 (U. S. Code, tit. 29, § 187, subd. [a], par. [1]) which provides that it shall be an unlawful labor objective to engage in concerted action where an object thereof is to force or require any employer to cease doing business with any other person. Moreover, as the United States Supreme Court pointed out in *Hunt* v. *Crumboch* at page 826, whether such conduct amounted to an actionable wrong under State law was not within the scope of that decision. As was shown in *Mayer Bros. Poultry Farms* v. *Meltzer* (274 App. Div. 169, 175–178), the construction placed by the Supreme Court upon the Federal antitrust laws is not binding on the State courts in the inter-

pretation of their own common or statute law against monopolies. It was expressly so held respecting our section 340 of the General Business Law in *Marsich* v. *Eastman Kodak Co.* (244 App. Div. 295, affd. 269 N. Y. 621). The trial court correctly instructed the jury that, in applying section 340 of the General Business Law, they must bear in mind that due to an exception therein, '' There can be monopolies in the labor union movement. It is not illegal to have a monopoly there, providing that the monopoly, in what it does, does only those things, of course, which have relation to legitimate labor aims.'' The jury found that this monopoly was not being exerted to further '' legitimate labor aims '', a finding which was well supported by the evidence, and the jury's verdict should have been allowed to stand.

The following quotation from the dissenting opinion by Mr. Justice JACKSON in *Hunt* v. *Crumboch* (*supra,* p. 829) is, as it seems to me, in accord with the law of this State as reflected in the trial court's charge to the jury: '' Those statutes which restricted the application of the Sherman Act against unions were intended only to shield the legitimate objectives of such organizations, not to give them a sword to use with unlimited immunity. The social interest in allowing workers to better their condition by their combined bargaining power was thought to outweigh the otherwise undesirable restriction on competition which all successful union activity necessarily entails. But there is no social interest served by union activities which are directed not to the advantage of union members but merely to capricious and retaliatory misuse of the power which unions have simply to impose their will on an employer.''

Where a union departs from its proper sphere of activity, and engages in concerted action that is unrelated to its reason for existence, it loses the protection of laws enacted to safeguard its legitimate status. This is by the same token whereby a public officer, who abuses his office by employing it as a pretext to accomplish unlawful aims, becomes a law breaker when he transgresses the objects and purposes for which the office exists.

The formula of '' disinterested malevolence '' as applied in *Beardsley* v. *Kilmer* (236 N. Y. 80, 90) is not adapted to this sort of situation. Rather, we are confronted by an unlawful combination in restraint of trade which does not enjoy the exemp-

tion from liability of a labor union when it is exercising its proper functions. This is an action for damages for conspiracy, in ruining plaintiff's business by concerted action that has no relation to any lawful labor union objective. If these defendant unions in a closed or union shop industry may by concerted action prevent any union member from working for plaintiff under any terms of employment, it will be possible for any union similarly situated to drive out of business any employer whom the officers of the union dislike, or to accomplish any kind of ulterior purpose (*Auburn Draying Co.* v. *Wardell,* 178 App. Div. 270, affd. 227 N. Y. 1), although the employer is willing to deal with the union on the basis of prevailing wages, hours and working conditions, and by signing the customary labor contract. There is no justification in law for the use of the enormous power of unions in closed or union shop industries in such fashion. The action is arbitrary and without legal justification if it transcends lawful labor objectives, and confers a right of action under the established principle that business is property and that property may not intentionally be injured without justification in law (*Dorchy* v. *Kansas,* 272 U. S. 306; *Opera on Tour, Inc.,* v. *Weber, supra; American Guild of Musical Artists* v. *Petrillo, supra*).

The judgment entered on the order of the Appellate Division should be reversed and that of the Trial Term entered upon the verdict of the jury should be reinstated.

DYE, FULD and FROESSEL, JJ., concur with DESMOND, J.; VAN VOORHIS, J., dissents in an opinion in which LEWIS, Ch. J., and CONWAY, J., concur.

Judgment affirmed.