PER CURIAM.
Appellant Billingsley challenges (1) an adverse summary judgment on his petition to collect insurance or recover premiums after a fire loss, and (2) respondent Farmers' counterclaim judgment against him for prima facie tort based on Billingsley's complaint to Missouri's Department of Insurance. We affirm the former and reverse the latter.
Background
In late 1983, Billingsley, a Kansan, bought two adjacent Springfield rental *3 houses and engaged Carol Martin to manage them, then almost immediately warranty-deeded both houses to his sister, Joanna, a Springfield attorney.[1] In 1986, a fire policy was applied for and issued by Farmers to "Joanna V. Billingsley c/o Carol Martin Property Mgmt." as named insured, and was renewed each year with no change in the named insured even after Joanna deeded both houses back to Billingsley in 1992.
Fire destroyed one house in 2002. Farmers denied Billingsley's policy claim on the ground that it had not contracted with or insured him. In 2004, Billingsley sued Farmers on the policy or alternatively for a premium refund.[2] In 2010, Farmers won summary judgment on the policy claim, but was denied summary judgment on the refund claim, which remained pending.
In 2011, Billingsley complained to Missouri's Department of Insurance (MDI) about Farmers, citing the still-pending lawsuit and its case number. MDI requested Farmers to respond and provide all relevant documents within 20 days. Farmers paid its lawsuit counsel $4,354 to do so. After receiving Farmers' response, MDI encouraged Billingsley to work with his lawyer and defer to the court's official determinations, but took no action against Farmers.
Billingsley soon voluntarily dismissed his case and refiled a petition asserting seven counts against Farmers-five seeking to recover on the policy under various theories, plus a vexatious-refusal claim and an alternative count for premium refund. Farmers counterclaimed for prima facie tort based on Billingsley's MDI complaint.
Farmers again sought summary judgment, asserting that Billingsley would be unable to prove an element (or more) of each of his newly-pleaded claims. See ITT Commercial Fin. Corp. v. Mid - Am. Marine Supply Corp . , 854 S.W.2d 371, 381 (Mo. banc 1993). The court granted Farmers' motion,[3] then tried Farmers' counterclaim to a jury. At trial, Farmers claimed damages of $4,354 for its attorney fees in responding to MDI after Billingsley's complaint. The jury found for Farmers in that amount, plus $20,000 punitive damages.
After entry of a final judgment consistent with all the above, Billingsley filed this appeal. We first address his points challenging summary judgment on his petition's claims.
Points re Billingsley's Pleaded Claims
Preliminary Legal Principles
The first element of a traditional fire-policy claim is that an insurer issued a fire policy to the claimant. Travers v. Universal Fire & Cas ., 34 S.W.3d 156, 160 (Mo. App. 2000) ; MAI 31.09. That Farmers issued no policy to Billingsley prima facie defeats such claim, illustrated by Billingsley's prior summary-judgment loss on his 2004 petition.
*4 Seeing that he needed more to get to a jury, Billingsley dismissed that case and filed a beefed-up petition asserting new allegations and theories. To the extent these new allegations might let Billingsley recover although he had no policy, they were "elements facts" that were his burden to prove, so Farmers could show a prima facie right to judgment on any count by showing either:
1. facts that negated any one of Billingsley's "elements facts," or
2. that despite adequate time for discovery, Billingsley had not produced and would not be able to produce evidence sufficient to allow a factfinder to find the element(s) challenged by Farmers.
See ITT , 854 S.W.2d at 381. Billingsley could not then rest on his pleaded allegations, but had to produce specific facts showing a genuine issue for trial or suffer summary judgment. Id .
Points 1 & 2 (re Count I)
Billingsley's new petition alleged generally that Joanna was Billingsley's "agent" (without describing the agency's nature or scope), and its Count I policy claim hinged on those allegations. Yet even under that scenario and Billingsley's cited cases, he could not recover on the policy unless Joanna's agency to acquire and hold insurance for him had been disclosed to or known by Farmers. See Estes v. Great Am. Ins. Co. , 112 S.W.2d 153, 157-59 (Mo. App. 1938). See also United Fire & Cas. v. Garvey , 328 F.3d 411, 413-14 (8th Cir. 2003), and on subsequent appeal , 419 F.3d 743, 746-49 (8th Cir. 2005) (considering Estes in context of insurer's alleged captive agent).
As to Joanna's alleged agency, Farmers' statement of uncontroverted facts ("SUMF," see Rule 74.04(c)(1) ) established at least the following:
• Joanna never represented to Farmers or its alleged agent ("Insurors") that she was Billingsley's agent for the purpose of procuring insurance. She had no contact with Farmers or Insurors regarding the properties or their insurance prior to the fire. She did not know she was the named insured until after the fire. She never talked with Billingsley before the fire about who the policy insured, and took no action herself to check or confirm who was insured.
• Carol Martin never knew of the deeds to or from Joanna, or that anyone but Billingsley owned the properties the entire time. She testified that, prior to the post-fire lawsuit, neither Billingsley nor Joanna nor anyone else ever told her that Joanna was any kind of agent regarding the properties.
• Billingsley had no contact with Farmers or Insurors regarding the properties prior to the fire.
Farmers thus successfully asserted that Billingsley could not produce evidence from which jurors could find either Joanna's agency or Farmers' scienter.[4]
*5 Even if one assumes arguendo Joanna's agency as pleaded, we cannot find where Billingsley's petition alleges that Joanna disclosed her agency to anyone, or that anyone knew she was Billingsley's agent for property-insurance purposes or otherwise, or that the summary-judgment record raises a genuine issue as to scienter of Joanna's property-insurance agency. Points 1 or 2 do not address Billingsley's failure to plead or prove this "elements fact" of his claim. Points denied.
Point 3 (re Count IV)
To quote Billingsley's brief, "Count IV of the petition asserted that Carol Martin and/or Joanna Billingsley had insurable interests and were entitled to recover under the policy." Billingsley's third point charges that Farmers did not show a prima facie right to judgment on Count IV because Farmers' SUMF omitted "that Carol Martin and Joanna Billingsley did not have insurable interests in 1516 North Grant related to obligations to insure the property or otherwise...."
Initially, we note that this complaint, like most of Billingsley's summary-judgment points, indicates a failure to understand Rule 74.04 burden shifting:
"When a motion for summary judgment is made and supported as provided in this Rule 74.04," i.e. , when the movant makes a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Rule 74.04, shall set forth specific facts showing that there is a genuine issue for trial." Rule 74.04(e). [Emphasis added.]
ITT , 854 S.W.2d at 381.
In other words, it is not enough that Billingsley's summary-judgment points complain that Farmers did not also negate facts that either were (1) Billingsley's duty to show after the I TT /Rule 74.04 burden shifted, or (2) not "material" because they would not change Farmers' right to judgment. Particularly as to the latter, we reiterate that Farmers only had to knock out (so to speak) one element of a pleaded claim to win summary judgment, not multiple elements or other allegations of the petition. ITT , 854 S.W.2d at 381.
At any rate, Billingsley fails to show how Joanna had any insurable interest after she parted with title in 1992 (see Estes , 112 S.W.2d at 157, 157-58 ), or how property manager Carol Martin ever had an insurable interest, or, for that matter, his right, by assignment or otherwise, to assert their claims. We deny Point 3.
Point 6 (re Count III)
We take this point out of order. Billingsley's Count III alleged that the property was mortgaged, and the policy identified and insured the mortgagees at the time of loss, but Farmers denied the mortgagees' claim, forcing Billingsley to pay "approximately $20,000.00" to satisfy the mortgage, so he sought "at least $20,000.00" from Farmers.
Per the summary-judgment record, (1) the mortgage was satisfied, released, and thus extinguished before the mortgagees submitted their policy claim; and (2) further, Farmers denied the mortgagees' claim for the stated reasons that they "misrepresented the amount due and owing *6 on the Note and ... failed and refused to provide records and documents requested by Defendant Farmers that were necessary to calculate the actual amount due and owing on the Note."
Billingsley, in Point 6, claims this summary judgment was improper because Farmers' SUMF "omitted as an actual material fact" that Farmers had no policy obligation to pay the mortgagees. We disagree for at least two reasons. First, the burden had shifted to Billingsley to show, despite the summary-judgment record, some evidence that the mortgagees were entitled to recover on the policy. ITT , 854 S.W.2d at 381. Second, as with the last point, Billingsley fails to show (or even to have pleaded) his standing to assert the mortgagees' policy rights. We deny Point 6.
Points 4 & 5 (re Counts II & V)
Billingsley challenges the summary judgments on Count V (policy coverage by estoppel) and alternative Count II (premium refund for unjust enrichment) because Farmers' SUMF did not assert that Farmers could retain premiums "after asserting that the policy was void and after denying that anyone was insured or entitled to coverage" thereunder.
The underlying principle was discussed in Gutting v. Shelter Mut. Ins. Co. , 905 S.W.2d 550 (Mo. App. 1995), which collected over a dozen Missouri cases to the following effect: When an insurer asserts that its policy "was not in force and effect from the beginning, it is its duty to tender back to [the insured] the premiums paid by him within a reasonable time after the discovery of the facts upon which it intends to base such defense." Id . at 551 (internal quotation marks and citation omitted).
Yet Billingsley offers no adequate response when Farmers notes that it did not claim the policy was void ab initio or that Farmers "was entitled to receive, accept and retain premiums in exchange for providing coverage to the named insured [from 1986-92 when Joanna held title] and mortgagees as described herein [from 1986 policy inception through 2002 loss]."[5] Points 4 and 5 fail.
Point 7 (re Count VII)
Billingsley's Count VII vexatious-refusal claim required success on his policy claim. See MAI 10.08 ("If you find in favor of plaintiff on the claim on the insurance policy, and if...."). Failure of the foregoing points thus moots this one.
Having found no merit in Points 1-7 relating to Billingsley's pleaded claims, we affirm the judgment in those respects and turn next to the counterclaim judgment for prima facie tort.
Points re Prima Facie Tort Judgment
Preliminary Legal Principles
"Missouri courts, while recognizing prima facie torts at least nominally, do not look upon them with favor and have consistently limited the application of the prima facie tort." Hertz Corp. v. RAKS Hosp., Inc. , 196 S.W.3d 536, 549 (Mo. App. 2006). The theory's essential elements are said to be (1) an intentional lawful act by the defendant; (2) with intent to injure the plaintiff; (3) resulting in such injury; and (4) no justification or insufficient justification *7 for the defendant's act. See Porter v. Crawford & Co. , 611 S.W.2d 265, 268 (Mo. App. 1980).
Points 9 & 11 (Damages)
We begin with Billingsley's Point 9 complaint that "the only damages Farmers claimed were the attorney fees it incurred in responding to the Department of Insurance and those fees were not allowed under any exception to the American Rule."[6] In reply, Farmers claims benefit of the "collateral litigation" exception and argues that no Missouri case "squarely holds" said exception could not apply here.[7]
We also find no particularly helpful Missouri case. But in introducing prima-facie-tort doctrine to Missouri jurisprudence, Porter accurately observed that "the leading modern authorities arise in New York"; that "in no state other than New York has the doctrine been developed with such care"; and that "the willingness of the New York courts to recognize and confront the issues presents an unusual opportunity to vicariously assess the whole ambit of issues involved in the development and application of the theory." 611 S.W.2d at 270.
The only New York case we find runs against Farmers' position. See Howard v. Block , 90 A.D.2d 455, 454 N.Y.S.2d 718 (1982) (attorney fees incurred in prior proceedings not recoverable in prima facie tort). "That prior actions were meritless or vexatious does not, without more, spell out prima facie tort, and attorney's fees incurred therein do not spell out special damages...." Id . at 719.
We see no reason to depart from this view. We grant Point 9 against Farmers' judgment for actual damages, as well as Point 11 as to the punitive-damage award, which fails absent an actual-damage recovery ( Ellison v. Fry , 437 S.W.3d 762, 777 (Mo. banc 2014) ), and reverse the counterclaim judgment in its entirety.
Further Observations
Although Billingsley's remaining points are moot, we would be remiss not to observe that Farmers never proved the third element of prima-facie-tort liability per Porter ; i.e. , that the intended injury resulted.
According to Farmers' not-in-MAI verdict director,[8] Billingsley intended to injure Farmers "by compelling it to pay him" under the policy, which never happened. The legal fees Farmers claimed as damages differed from the "injury" required for prima facie tort. See Porter , 611 S.W.2d at 271, and its cited authority, *8 Restatement (Second) of Torts § 870 comment e (1977).[9]
Further, even had Billingsley succeeded in "compelling [Farmers] to pay him coverage," we gravely doubt that an insurer suffers tortious "injury" when it pays a policy claim-especially due to a claimant's lawful act-or that a claimant "intends to injure" an insurer by lawfully seeking policy proceeds. In Restatement terms per Porter , prima facie tort demands not just "harm" (any loss or detriment; compare MAI "damage"), but "injury," which means harm "to a legally protected interest of the plaintiff" and limits recovery "to those cases in which the plaintiff's harm is of such a nature and seriousness that legal redress is appropriate." Comment e; see also Porter , 611 S.W.2d at 271, describing such "injury" as "necessary" to a prima-facie-tort claim and as restricting liability "to the invasion of a legally protected interest."
Do insurance companies have a "legally protected interest" in stopping claimants' lawful actions aimed at policy recovery? Is an insurer's harm from paying policy claims "of such a nature and seriousness that legal redress is appropriate" when the claimant has acted lawfully, and even with some justification?
At any rate, Farmers neither proved nor did its verdict director properly hypothesize the "injury" Billingsley allegedly intended to cause, so the instruction was erroneous and the counterclaim unproved. We leave other instructional observations, specific and general, to the concurring opinion.
Conclusion
We reverse the counterclaim awards of actual and punitive damages for prima facie tort, affirm the judgment in all other respects, and remand for entry of an amended judgment consistent with this opinion. Any motions still pending before this court are denied.
DANIEL E. SCOTT -CONCURRING OPINION AUTHOR
CONCURRING OPINION
I concur in the court's well-reasoned opinion. Instruction 6 also is a roving commission because it requires jurors to determine whether Billingsley "acted with insufficient justification" (in part a policy decision, see infra and appendix) unaided by any definition of "justification" or guidance as to its potential "sufficiency."[1]
But I write primarily because the Restatement § 870 commentary underlying Porter v. Crawford & Co. violates core MAI philosophy. Per Comment e, prima-facie-tort liability "cannot be neatly divided into [the] several separate, mutually exclusive determinations" required by any *9 Missouri verdict director, much less a pattern instruction to fit all such cases.
To appreciate the instructional difficulties seen in 38 years of failed prima-facie-tort cases since Porter ,[2] "one must understand MAI as 'more than a collection of approved instructions,' " but rather a "holistic approach, borne of much research and great effort, focused on simplicity to radically improve jury instruction in our courts." Hale v. BNSF Ry. Co. , 524 S.W.3d 603, 605 (Mo. App. 2017). The genius of MAI-style verdict-directing instructions is seen in MAI "Why and How to Instruct a Jury," particularly when it uses a hypothetical car-wreck case to
illustrate[ ] a most difficult concept for neophytes to jury instruction. By MAI 17.01, the judge never does say, expressly, that the defendant had a duty to stop and yield to plaintiff. Why not? Well, the trial judge has got to decide the issues of law. The court can not have the jury second guessing an application of the law to the facts of the case. By telling the jury nothing about defendant's legal duties but telling the jury what to do on its decision of the facts, the judge has instructed the jury in the application of the law to the facts . By using MAI 17.01, the judge instructs, legally, that if the defendant "violated the traffic signal" he has violated a legal duty imposed on those who (1) operate motor vehicles (2) on public streets and (3) approach traffic control signals which (4) are in place under authority of law. The judge does not instruct by stating abstract rules of law but by deciding, as a matter of law, which rules of law are applicable and telling the jury what to do on the jury's decision of the facts.
The frequently heard complaint, "The judge didn't tell the jury the defendant had a duty to stop" is invalid. The judge does tell the jury. This message is paraphrased as; "If you find the fact to be that defendant violated the traffic signal, then he violated his legal duty to plaintiff to stop and yield to plaintiff." Under MAI, the judge continues to decide and apply the law and, thus, instructs in the law; the jury decides the facts and does what the judge tells them to do (as a matter of applied law) with the facts.
Id . at LXVI (7th ed. 2012) (my bolding, italics in original).
This brilliant approach works for established torts because, to quote the Restatement, "a balancing of the conflicting interests of the litigants in the light of the social and economic interests of society in general ... has been already worked out and developed in the form of a set of rules." Comment c. This means that
[i]n determining whether liability should be imposed in a particular case for an established intentional tort, neither court nor jury engages afresh in balancing the conflicting interests of the parties. That has already been done in the creation of the legal rules of liability and privilege and all that is needed is to determine the facts and apply these rules to them.
Comment d.
In stark contrast, prima-facie-tort theory bespeaks "standards that vary with the circumstances to which they are applied." Comment a. For each fact scenario, a judicial-balancing test must first determine if "tort liability is appropriate for the type of situation that is presently before the court. " Comment j (my emphasis).
*10 Porter agrees. "The [trial] court first must weigh and consider the balance of social values to determine if the defendant's acts are tortious." 611 S.W.2d at 270. Comment k speaks in the same vein:
It is the function of the judge to engage in the process of applying the factors listed [by the Restatement, see infra and my opinion appendix] in balancing the interests to determine whether tort liability will exist for the type of injury that the defendant has imposed on the plaintiff and what privileges will apply. It is the province of the jury to apply the rules and standards laid down by the judge to the facts that it finds to exist.
This need for an initial, case-specific, judicial weighing and balancing of policy concerns effectively rules out pattern jury instructions, especially when any lawful act conceivably could support tort liability. Instead, Comment e tasks the trial judge to undertake a potentially Herculean "evaluative process" that
[w]hen analyzed, breaks down into a set of four factors. These include: (1) the nature and seriousness of the harm to the injured party, (2) the nature and significance of the interests promoted by the actor's conduct, (3) the character of the means used by the actor and (4) the actor's motive. The first factor is of primary concern in applying the blackletter term, injury, and the second factor is of primary concern in applying the blackletter term, not justifiable; the first, third and fourth factors are of substantially equal significance in applying the blackletter term, culpable.
See also Porter , 611 S.W.2d at 270 (citing Comments e and k).
Yet the above merely begins to describe the Restatement's balancing process to determine "the rules and standards [to be] laid down by the judge to the facts that it finds to exist" (Comment k) in the form of proper jury instructions for that particular case. I have quoted those provisions and relevant Porter excerpts in this opinion's appendix. I invite readers to examine them carefully. They are "written for readers trained in the law [and] conversant with the law's well-focused, but esoteric vocabulary," but ultimately "must be reduced to instructions that attempt to tell lay people how to weigh evidence, assess fault, and award damages, if appropriate." Burnett v. Griffith , 769 S.W.2d 780, 788 (Mo. banc 1989). They not only show why prima facie tort does not work under MAI, but perhaps why it has never worked at all.
I question whether Missouri should recognize any cause of action that cannot bend to MAI principles; where submissibility and proper jury instruction cannot be determined by reference to established tort elements, but require trial judges to conduct multi-faceted " 'balancing of the conflicting interests of the litigants in the light of the social and economic interests of society in general.' " Porter , 611 S.W.2d at 270 (quoting Comment c). Given prima facie tort's negligible following elsewhere and failed track record here, perhaps we should consider whether this well-intended but flawed theory has run its course.
CONCURRING OPINION APPENDIX
From Restatement (Second) of Torts § 870 (1977) Liability for Intended Consequences-General Principle
One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.
Comment:
*11 a. Nature of Section. This Section is intended to supply a generalization for tortious conduct involving harm intentionally inflicted. Generalizations have long existed for negligence liability, involving conduct producing unreasonable risk of harm to others (see §§ 282, 291-294), and for strict liability, involving the carrying on of an activity that is abnormally dangerous. (See §§ 519-520). As for conduct intentionally causing harm, however, it has traditionally been assumed that the several established intentional torts developed separately and independently and not in accordance with any unifying principle. This Section purports to supply that unifying principle and to explain the basis for the development of the more recently created intentional torts. More than that, it is intended to serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted, even though the conduct does not come within the requirements of one of the well established and named intentional torts.
The principle set forth in this Section has been recognized in various forms, often incomplete in their expression. It is sometimes called an innominate form of the action of trespass on the case; and in New York particularly, it has been given the appellation of a "prima facie tort" and efforts have been made to set forth its requirements with more rigidity. This Section does not attempt to establish precise and inflexible requirements. Instead, it lays down general guidelines and uses words expressing standards that vary with the circumstances to which they are applied. It is stating a general principle rather than setting forth specific rules.
b. Intentionally causing harm. An intentional tort is one in which the actor intends to produce the harm that ensues; it is not enough that he intends to perform the act. He intends to produce the harm when he desires to bring about that consequence by performing the act. As indicated in § 8A, he also is treated as intending that consequence if he knows or believes that the consequence is certain, or substantially certain, to result from his act. In some cases in which the claim may be entirely novel the court may decide to limit the liability to the situation in which the defendant acted for the purpose of producing the harm involved.
For certain early developing torts, such as assault, battery and false imprisonment, it is held not to be necessary to intend to harm the plaintiff, but intent to commit the tort (or a similar one) on a third person is sufficient. (See §§ 16, 32, 43). This "doctrine of transferred intent" has not been applied to newly developing torts arising out of the action of case and should have no application to this Section. Intent to commit the tort on a third person may, however, make it easier to find that the actor's conduct was substantially certain to cause harm to the plaintiff, as, for example, when the actor tells a falsehood to the plaintiff for him to relay to the third person and the plaintiff himself relies upon it to his detriment.
c. Balancing of interests. Tort law involves a balancing of the conflicting interests of the litigants in the light of the social and economic interests of society in general. In the cases of negligence and strict liability, this balancing process takes place in the application of the standard involved (conduct creating an unreasonable risk of harm, or activity that is abnormally dangerous). It is the plaintiff's responsibility to satisfy the appropriate agency that the standard has been breached. For negligence the appropriate agency is normally the jury (see §§ 328B, 328C); for strict *12 liability it is the court. (See § 520, Comment l ).
For the established intentional torts, this balancing process has been already worked out and developed in the form of a set of rules. The individual torts have been set up to protect interests of the injured party, with their individual attributes designated by legal rules. The interests of the actor are protected by a set of established privileges, with their individual attributes also established by legal rules. There is thus no need of using the balancing process afresh for each case in which an established tort exists; and the task is merely to apply the legal rules to the facts.
d. Relationship to established torts. Thus the established intentional torts and their established legal privileges amount to crystalizations of the general principle stated in this Section. In determining whether liability should be imposed in a particular case for an established intentional tort, neither court nor jury engages afresh in balancing the conflicting interests of the parties. That has already been done in the creation of the legal rules of liability and privilege and all that is needed is to determine the facts and apply these rules to them.
In many situations in which liability has been imposed under the principle stated in this Section, newly recognized categories of intentional tort have been developed or are still in the process of development. A prime example of a tort presently not fully developed is intentional infliction of emotional distress; its contours are not yet fully clear. (See §§ 46-48). Other categories of fairly recent development include injurious falsehood, interference with contractual relations and interference with prospective economic advantage. The more mature the stage of development the more definite the contours of the tort and of the privileges that may be defenses to it.
e. Basis for liability. Obviously, it is not every intentionally-caused harm that deserves a remedy in tort. The determination of which ones should be the subject of tort liability is made by resorting to the balancing process described above and analyzed in more detail below. For negligence and strict liability it is a one-step process, and a single phrase is used to describe the test. For intentional torts, it is a two-step process. The requirements are worked out both for a prima facie tort and for a privilege amounting to an excuse or justification. This makes it appropriate to use more than one phrase in expressing the test for intentional torts in balancing the conflicting interests.
The blackletter statement for this Section uses three expressions that are descriptive of the balancing process. It speaks of (1) an injury to another, (2) the culpable character of the actor's conduct and (3) the unjustifiable character of his conduct under the circumstances.
As indicated in § 7, the words "injury" and "harm" are used with different meanings in this Restatement. Harm denotes "the existence of loss or detriment in fact of any kind"; injury denotes "the invasion of any legally protected interests of another." The use of the term, injury, in this Section means that the harm must be to a legally protected interest of the plaintiff. Recovery is thus limited to those cases in which the plaintiff's harm is of such a nature and seriousness that legal redress is appropriate.
The requirement that the actor's conduct be both culpable (in general) and unjustifiable (under the circumstances) emphasizes the dual nature of the determination. The conduct must first be improper or wrongful; it must be blameworthy, not in accord *13 with community standards of right conduct. It may involve use of physical violence or falsehood or otherwise be of a type that is suitable for the existence of prima facie liability in tort.
The conduct must also be not excusable or justifiable; a privilege should not be applicable. The two terms are together descriptive of the evaluative process that the court must follow.
This evaluative process therefore involves utilization of all three of the blackletter terms. When analyzed, it breaks down into a set of four factors. These include: (1) the nature and seriousness of the harm to the injured party, (2) the nature and significance of the interests promoted by the actor's conduct, (3) the character of the means used by the actor and (4) the actor's motive. The first factor is of primary concern in applying the blackletter term, injury, and the second factor is of primary concern in applying the blackletter term, not justifiable; the first, third and fourth factors are of substantially equal significance in applying the blackletter term, culpable. The balancing process, however, necessarily involves one single determination, and it cannot be neatly divided into several separate, mutually exclusive determinations.
For one intentional tort-nuisance, when it involves intentional invasion of another's interest in the use and enjoyment of land-the single word "unreasonable" is used to describe the balancing process. (See §§ 826-829A). For the tort of interference with contractual relations, the word "improper" is used. (See § 767). A single term, like "wrongful," might have been used here. But the traditional dichotomy in intentional torts of prima facie tort and privilege suggests the desirability of using more than one term.
f. Nature and seriousness of the harm to the injured party. There are many harms that individuals must bear as the price of living in a society composed of many individuals. The law cannot undertake to protect people from the hurt feelings incident to the give and take of daily life. Thus, if one person "snubs" another on the street by refusing to speak to him or invites all of the neighbors except one to a reception, there is no cause of action for either slight, even though it was intended to produce harm.
On the other hand, other types of harm are just as clearly entitled to the protection of the law. Physical harm to the person has been recognized as the basis for an intentional tort from the earliest days of the common law. It weighs heavily in the process of balancing the interests, but other contravening factors may under certain circumstances outweigh it, as in the instance of self-defense. Physical harm to property also weighs heavily. Harm to existing advantageous relations weighs less heavily than physical harm, and harm to prospective pecuniary interests, less heavily still.
The significance of emotional harm varies considerably depending largely upon its severity. Indeed, in all cases, the severity of the harm is an important consideration, and a serious harm to an interest less deserving of protection may be a more important factor in finding liability than a slighter harm to a more significant interest.
g. The interests promoted by the actor's conduct. These interests are the ones that have become the basis for established privileges. Thus protection of oneself becomes self-defense and protection of property becomes the privilege of defense of possession or recapture. The importance of these interests to the owner and to society is a *14 significant factor in the balancing process. Thus seeking of business through competition has significance and may make the defendant's interference with the plaintiff's prospective economic advantage justified (i.e., privileged), but it does not justify an interference with an existing contractual relationship.
The defendant may not have been acting with a specific purpose in mind or with the intention of promoting a particular interest, and yet the interest that he is in fact promoting may still be of importance. Thus, in a quarrel between him and the plaintiff, he may lose his temper and call the plaintiff some bad names. This may inflict a certain amount of emotional distress upon the plaintiff. But if the conduct is not outrageous and plaintiff is not known to be peculiarly sensitive or vulnerable, an action of tort will probably not lie. The harm to the plaintiff is not serious and there is some social interest in not putting undue restrictions on the mere thoughtless use of language and in allowing an angry person to purge himself of the pent-up spleen. On the other hand, if defendant was using the abusive language deliberately and for a preconceived purpose, as if he is a bill collector, then he may be held subject to liability. This is the way in which the balancing process works.
h. Character of the means used by the actor. The actor's conduct is the means by which he imposes the harm upon the injured party. The reference is to the moral and legal character of that conduct. If the means is illegal or unfair or immoral according to the common understanding of society this constitutes a factor favoring liability. Thus, if a defendant seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product, the fact that he has deliberately lied is a factor militating toward liability. Assume a case in which a father is preparing to execute a will disinheriting his daughter and leaving his property to his nephew. If the daughter's husband persuades the father not to execute the will, he is not liable to the nephew. If he kills the father to prevent the execution of the will, the means used is both illegal and immoral and he is subject to liability to the nephew. A similar result is reached if he persuades the father to destroy the will by telling him defamatory falsehoods about the nephew.
Of course, acts that are in violation of civil or criminal statutes or that are tortious with respect to third parties may be strongly indicative of liability.
i. Actor's motive. If the only motive of the actor is a desire to harm the plaintiff, this fact becomes a very important factor. A motive of this sort is sometimes called disinterested malevolence, to indicate that the defendant has no interests of his own to promote by his conduct, other than venting his ill will. It is sometimes said that an evil motive cannot make tortious an act that is otherwise rightful. The nature of the motive, however, may be a factor that tips the scale in determining whether the liability should be imposed or not.
The actor's purpose may also be significant. For some torts it may be held not to be sufficient that the actor knew that his conduct was substantially certain to produce the injury, and it may be necessary that he desired to bring it about.
j. Form of the innominate tort. If a balancing of the conflicting interests, with consideration of the factors listed above, produces the conclusion that tort liability is appropriate for the type of situation that is presently before the court, the question still remains as to what form the new tort *15 should take. The form will be similar to that of other, well-established, intentional torts, rather than that of negligence, where the decision depends upon the single determination of whether the defendant's conduct produced an unreasonable risk or not. That is, the requirements will be laid down for the existence of the prima facie tort but there will be appropriate privileges that may constitute a defense to the action.
The new tort may be closely related to an established tort and thus allow tort recovery when a restrictive rule of the traditional tort would not permit it. For example, the tort of assault has traditionally required the creation of apprehension of an imminent battery. Some cases have permitted recovery when the threat is not imminent but still is a very real one of a serious battery, to take place in the near future. Again, the tort of false imprisonment requires the setting of boundaries confining the plaintiff. It has been held that an innominate action of case may permit recovery for restraining a person from going into a place where he has a right to go. In determining whether a new tort can appropriately eliminate a restrictive feature of a traditional tort it is important to give careful consideration to the nature of the restriction. If it came about as a historical accident or for reasons that no longer have real significance, the new tort without it may serve a useful purpose. If the restriction expresses an important policy of the law against liability, however, the significance of that policy should continue regardless of the name of the tort involved or the date of its origin.
On the other hand the new tort may be an entirely novel one. This was true, for example, of the first cases holding that a tort action would lie for invasion of the right of privacy (see Chapter 28A) or holding that a person might recover for the telling of an injurious falsehood about him even though it was not defamatory. (See Chapter 28).
Recognized privileges for the established torts that are most analogous to the newly-created tort will usually be held applicable to the new tort, but a deliberate decision must be made as to this issue.
So long as the form of the new tort follows the customary format for intentional torts of requirements for existence of a prima facie tort subject to being met by appropriate privileges, the usual rules for the burden of proof will apply. The plaintiff may be expected to have the burden of pleading and proving the elements of the prima facie case and the defendant to have the burden of pleading and proving the existence of any privilege that may be applicable.
k. Functions of judge and jury. It is the function of the judge to engage in the process of applying the factors listed above in balancing the interests to determine whether tort liability will exist for the type of injury that the defendant has imposed on the plaintiff and what privileges will apply. It is the province of the jury to apply the rules and standards laid down by the judge to the facts that it finds to exist.
In the established tort of battery, for example, the judge tells the jury that the cause of action exists for an intentional harmful or offensive touching and that a person may use a reasonable amount of force to prevent the touching. The jury determines whether the touching was harmful or offensive and whether the force used in self-defense was reasonable. An analogous allocation of functions exists with a newly created tort. A similar analogy applies in regard to the burden of proof. (See § 10).
*16 l. Causation. For liability to exist, the defendant's conduct must have been the cause in fact of the harm to the plaintiff. The rules on cause in fact for negligent conduct are applicable here in the case of intentional conduct. (See §§ 431-434). On legal cause for intentional harm, see §§ 435A, 435B.
m. Damages. With the exception of established torts deriving from the action of trespass, proof of actual harm is required. (See § 907). This would certainly be true of any new tort arising under this Section. The harm need not be pecuniary in nature. On damages in general, see Chapter 47. On punitive damages, see §§ 908 and 909.
n. Defenses. Privileges as defenses are treated above. Consent is a defense if freely given by a person of full capacity and not against public policy. (See § 892). Contributory negligence is not a defense to an intentional tort (see § 481), nor are the damages diminished by the negligent failure of the injured person to avoid an intended consequence. (See § 918).
The appropriate statute of limitations is a matter of statutory language and interpretation. A court will not ordinarily allow a plaintiff who would have an action for an established tort with a short statute of limitations to seek to recover under a general, and longer, statute of limitations, by contending that he can recover for an innominate tort existing under this Section.
o. Cross references. For the meanings of harm and of injury, see § 7. As indicated in § 5, the words "subject to liability" mean that the actor's conduct makes him liable for an injury provided it is the legal cause of the injury and the actor has no defense to the claim.
------------------
From Porter v. Crawford & Co. , 611 S.W.2d 265, 266, 268, 268-72 (Mo. App. 1980)
The principal issue to be resolved is whether or not the law of Missouri will permit a recovery in tort for a lawful act performed maliciously and with the intent of causing harm to a plaintiff.
* * *
To facilitate the discussion, a statement of the elements of this theory of [prima facie] tort liability will be stated in summary form as gleaned from the sources to be later discussed. The elements so summarized are:
1. Intentional lawful act by the defendant.
2. An intent to cause injury to the plaintiff.
3. Injury to the plaintiff.
4. An absence of any justification or an insufficient justification for the defendant's act.
* * *
The question is thus squarely presented as to whether or not Missouri will undertake to recognize a recovery upon the basis of an intentional tort under the principles of the case law in other jurisdictions developing what has been styled, "the prima facie tort doctrine."
Prima facie tort doctrine is a result of a controversy that has been waged for generations among the legal scholars with respect to the fundamental concept of tort liability. The dispute and citation to its protagonists are set forth in Forkosch, An Analysis of the "Prima Facie Tort" Cause of Action, 42 Cornell L.Q. 465 (Summer 1957). The article traces the analysis by the scholars.
In the early development of tort law, it was assumed that the only tort liability which could be recognized was tort liability *17 arising within the framework of one of the specific trespass writs. Maitland, The Forms of Action at Common Law, pp. 4-5 (1941); Forkosch, supra , n.2, p. 465. Scholarly research has indicated that this was a misconception and that the early common law recognized the flexibility of trespass on the case to deal with other forms of tort action not specifically included in the traditional trespass writs. Maitland, supra at 66.
There is no need to detail the long and convoluted history of the dispute over the nature and function of the tort law. It is clear that modern scholarship considers that there exists a residue of tort liability which has not been explicated in specific forms of tort action and which is available for the courts to develop as common law tort actions as the needs of society require such development. Brown, The Rise and Threatened Demise of the Prima Facie Tort Principle, 54 Northwestern L.R. 563, 573 (1959-1960). The emerging products liability recovery theories and the relatively recent development of theories in the recovery of damages for intentional infliction of emotional distress are demonstrative of the willingness of the courts to draw upon traditional concepts of tort liability and impose liability in new forms and under new factual situations.
The Restatement (Second) of Torts, in § 870, has stated a guide for the development of new forms of intentional tort, expressed a rationale for imposing such liability and provided guidelines for the imposition of such liability. The Restatement, however, stops short of defining a specific tort of general application.
The origin of the prima facie tort doctrine in the United States is found in Aikens v. Wisconsin, 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154 (1904). In that case, Justice Holmes conceptualized the tort in the following language: "Prima facie, the intentional infliction of temporal damages is a cause of action which as a matter of substantive law, whatever may be the form of the pleading, requires a justification if the defendant is to escape." Other language in that case gave rise to the notion of "disinterested malevolence" as characterizing the motivation for conduct justifying the imposition of tort liability. By that phrase, Justice Holmes looked to the ordinarily lawful conduct and indicated that if conduct otherwise lawful was not done to achieve a beneficial end for the actor but was done solely with a malevolent intent to injure the plaintiff, the conduct became actionable.
The case law development clearly has tempered the requirement that an act be totally malevolent before it became actionable. This is based in part upon criticism that disinterested malevolence and justification represent a contradiction. The argument is that a wholly malevolent act can never be justified and that a purpose other than malevolent desire to injure the plaintiff is, in itself, a justification for the act. Forkosch, supra at 474. G. Alexander, Commercial Torts, Chapter 6 (1973).
Thus, the modern authority seems to agree that what is involved in the two concepts of malevolence and justification is that the plaintiff's cause of action must include proof of an actual intent to injure and if another purpose appears in the actor's conduct which amounts to a justification, then the wrongful act and the justification will be weighed to determine whether the justification in terms of societal value outweighs the wrongful motive of the defendant in attempting injury to the plaintiff.[1]
Justice Holmes' opinion in Aikens, supra , is often cited as the seminal case in the *18 field of intentional tort in the performance of a lawful act. Aikens, however, but reflects the earlier opinions of Justice Holmes when he was sitting as a member of the Massachusetts court. Justice Holmes developed the doctrine in a very early line of Massachusetts cases. Moran v. Dunphy, 177 Mass. 485, 59 N.E. 125 (1901) ; Plant v. Woods, 176 Mass. 492, 504, 57 N.E. 1011, 1015 (1900) (dissenting opinion); Vegelahn v. Guntner, 167 Mass. 92, 104, 44 N.E. 1077, 1079 (1896) (dissenting opinion). Holmes, in Privilege, Malice, and Intent, 8 Harv.L.Rev. 1 (1894), provides the theoretical underpinning for the Massachusetts decisions and ultimately for Aikens, supra. Even those early Massachusetts cases had a sound basis in the English authority for the development of the doctrine. The most frequently cited English case is Mogul Steamship Co. v. McGregor Gow & Co., 23 Q.B.D. 598 (1889), affirmed A.C. 25 (1892); but it, too, rests upon earlier cases developing the doctrine from a theoretical basis to applications in the case law. The English cases, no doubt, were strongly influenced by the Statute of Westminster, the Second:
"let a writ be made by those learned in the law so that for the future it shall not befall that the court fail in doing justice to complaints." 13 Edw. I, c. 24 (1285) (Plucknett trans.).
The general sense of the great English statute referred to exists in our own organic law in Mo.Const. Art. I, § 14, "certain remedy for every injury to person, property or character." A case resting the theory of recovery in tort for alienation of affections resulting in loss of support by plaintiff children upon the broad ground of a similar provision of the Illinois Constitution, Art. 2, § 19, is Daily v. Parker, 152 F.2d 174 (7th Cir. 1945). The theory of liability does not rest alone upon the theoretical basis and ancient authority thus far discussed. The cases prior to 1965 are collected in Annot., 16 A.L.R.3d 1191 (1967). Some discussion of the modern authority will serve to focus the issue in the present case.
Despite the early development of the Massachusetts law, the leading modern authorities arise in New York. Other states have, in part, adopted similar theories but in no state other than New York has the doctrine been developed with such care.
Many of the nominative tort theories, such as trespass, now rigidly defined, were evolved on a case-by-case basis. The development process tends to produce some confusion and uncertainty as to the courts' struggle with new and different fact settings and as the circumstances and ingenuity of counsel raise new issues for resolution. The history of the development of the prima facie tort doctrine is a classic example of that developmental process. The early adoption of the prima facie tort theory in New York and the willingness of the New York courts to recognize and confront the issues presents an unusual opportunity to vicariously assess the whole ambit of issues involved in the development and application of the theory.
The early cases in New York adopted the doctrine along the lines of Aikens and the Massachusetts cases. Ruza v. Ruza, 286 App.Div. 767, 1 A.D.2d 669, 146 N.Y.S.2d 808 (1955); Al Raschid v. News Syndicate Co., 265 N.Y. 1, 191 N.E. 713 (1934) ; Beardsley v. Kilmer, 236 N.Y. 80, 140 N.E. 203 (1923). Apparently fearful of expansion of tort liability beyond reasonable bounds, the New York courts devised limitations upon the doctrine. Sheppard v. Coopers', Incorporated, Sup., 13 Misc.2d 862, 156 N.Y.S.2d 391 (1956), affmd.
*19 2 App.Div.2d 881, 157 N.Y.S.2d 898 (1956). Those limitations, upon further analysis and consideration, have been largely eliminated, or at least made less restrictive than the early statements of them would suppose. An early limitation that the doctrine would not support a cause of action if the facts would also support a nominative tort has been largely dispelled by the analysis which suggests that under modern pleading, alternative and even contradictory theories may be pleaded. Board of Education, etc. v. Farmingdale Classroom Tchrs., 38 N.Y.2d 397, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975).
New York case law at one point also restricted the doctrine to cases where malice was the sole motivation for the acts complained of by the plaintiff. Reinforce, Inc. v. Birney, 308 N.Y. 164, 124 N.E.2d 104 (1954), but in Farmingdale Classroom Tchrs., supra, the New York Court of Appeals found the pleading sufficient and left to the proof in the case the balancing of the defendant's motivation in performing the act causing the injury (the evidence of bad motive) against the claim of justification of the act. The notion of the need to prove maliciousness as a sole motivation is subject to the same criticism as Justice Holmes' "disinterested malevolence not otherwise justified;" an act wholly malicious cannot be justified.
The Restatement (Second) of Torts (1977) has resolved the issue on the basis of a balancing of interests. The plaintiff must allege and prove bad motive on the part of the defendant. The defendant may plead and prove any justification. The court first must weigh and consider the balance of social values to determine if the defendant's acts are tortious. This balancing reflects the traditional role of the court in the direction of a verdict. Ultimately, the jury must balance the bad motivation of the defendant against the claimed justification for the act. Restatement (Second) of Torts § 870, Comment E, pp. 281-283, Comment K, p. 286 (1977). That position is consistent with the general principle underlying the statement of the doctrine. "Tort law involves a balancing of the conflicting interests of the litigants in the light of the social and economic interests of society in general." Restatement (Second) of Torts § 870, Comment C, p. 280 (1977).
A great many cases in New York have turned on the issue of the necessity for pleading "special damages." The cases are collected in Annot., 16 A.L.R.3d 1175 at p. 1215 (1967).
The general rule is that "general damages" are those that flow as a natural and necessary result of the act complained of and that "special damages" are damages which actually result from the act by reason of the special circumstances of the case and not as a necessary result of the act. Special damages may be pecuniary, but not inevitably so. 22 Am.Jur.2d Damages § 15, p. 31 ; Travelers Indemnity Company v. Chumbley, 394 S.W.2d 418 (Mo. App. 1965).
As Chumbley notes, "Damages both general and special constitute but a single element, albeit a necessary one, of a tort." The courts in New York have not always followed the generally accepted distinction between general damages and special damages. Instead confusion has arisen because special damages have been equated with pecuniary loss and the New York cases cannot be reconciled with the general rule. Because the requirement of the pleading of special damages has been so troublesome in New York, some further discussion is needed on that issue.
The requirement that special damages be pleaded with particularity is no stranger to *20 the law of torts. Libel and slander per se require no pleading of special damages, but where the words uttered or written require some additional factual matrix to demonstrate damage, it must be pleaded and proven. The requirement of some New York cases in the form that pecuniary damages must be pled and proven is erroneous as a misapplication of the general rule.
The rule vis-a-vis the general as opposed to special damages was intended to require more specific pleading when the claimed damage does not necessarily flow from the act complained of and not as a requirement of proof of pecuniary loss. The limitation of some New York cases of a requirement of proof of pecuniary loss was unquestionably imposed out of a concern that the lack of such a restraint might open the floodgate of litigation to meritless claim. That stricture has been criticised. 54 Northwestern L.R., supra at 570. The author of that article compares the stricture of the special damage rule in the field of prima facie tort liability to the use of the same restraint in defamation cases noting that its application in that field has been haphazard and discriminatory, 54 Northwestern L.R. at 571.
The Restatement (Second) of Torts has resolved the issue in § 870 by resorting to the definitions of "harm," "injury," and "damages," concepts established for all forms of recovery in tort. "Harm" is defined in Restatement (Second) § 7, p. 12 as "the existence of loss or detriment in fact of any kind." The word "injury" is defined by the same section as "the invasion of any legally protected interest of another." Comment A to § 7 Restatement (Second) of Torts makes it clear that "injury" may occur without "harm" and "harm" may occur with injury. "Harm" as so defined gives rise to a cause of action only when it results from the invasion of a legally protected interest, i. e., "injury." Section 870 thus focuses upon "injury" as necessary before any cause of action arises under the prima facie tort doctrine. The earlier drafts of the Restatement contained language suggesting harm. The debate preceding the adoption of the present language of § 870, Restatement (Second) of Torts, makes it clear that the omission of harm and the inclusion of injury was intended to restrict the section's application to the invasion of a legally protected interest. 53 ALI Proceedings 64 (1976).
Upon the basis of this analysis, the rule as to pleading special or general damages can take its proper place. An "injury" as an invasion of a legally protected right may cause either general or special damages. If the former, no special pleading is required. If the latter, the pleading must set forth the factual matters that give reasonable notice of the nature and extent of the claim.
What has been said thus far should suffice to show that the notion of a tort action based on common law precepts is accurately described in Restatement (Second) of Torts § 870 (1977). It should also appear from the analysis that the stricture upon the doctrine of the New York case law requiring pleading and proof of pecuniary loss is not analytically sound.
The only remaining question is a policy question concerning the propriety of the adoption of such a theory of tort liability in Missouri.
There seems to be no sound reason based upon either precedent or policy why Missouri should not adopt the New York view. None of the principles relied upon in the evolution of the doctrine are foreign to our law. The concept is consistent with the mandate of our organic law that there *21 should be a remedy for every injury. Mo.Const. Art. I, § 14. Missouri has not been reluctant to adopt new forms of action in tort based on Restatement principles. In Annbar Associates v. American Express Co., 565 S.W.2d 701 (Mo. App. 1978), the tort of injurious falsehood, a cause of action based upon § 623A Restatement (Second) of Torts, was recognized. Corcoran v. Southwestern Bell Tel. Co., 572 S.W.2d 212 (Mo. App. 1978), in analyzing a claim for invasion of privacy, relied upon Restatement (Second) of Torts § 652A. Our products liability cases have relied heavily on Restatement (Second) of Torts § 402A. Keener v. Dayton Electric Manufacturing Co., 445 S.W.2d 362 (Mo. 1969) ; Blevins v. Cushman Motors, 551 S.W.2d 602 (Mo. banc 1977) ; Brawner v. Liberty Industries, Inc., 573 S.W.2d 376 (Mo. App. 1978). Nor does such a tort require a name; Annbar Associates, supra.
The doctrine has been well developed in several states and Restatement (Second) of Torts § 870 has refined the principles of the case law into a workable guide for application of the doctrine. It must be concluded that, like New York and Massachusetts, as well as other states which have found support for the doctrine in common law principles, Missouri should adopt the Restatement view imposing such liability.

Because Appellant and Joanna share the same last name, we refer to Joanna by her first name as the parties did at trial.

Billingsley's claims against other parties and those claims' disposition are not at issue here.

Inappropriately titled "Findings of Fact, Conclusions of Law and Judgment." "The very nature of summary judgment precludes any necessity for a trial court to make findings of fact in granting it." Columbia Mut. Ins. Co. v. Heriford , 518 S.W.3d 234, 242 n.10 (Mo. App. 2017). When the material facts are undisputed, as we find here, a trial court has no need to make findings of fact to support its judgment. Id . at 243. Fortunately, "[o]ur review is essentially de novo ," using criteria "no different from those which should [have been] employed by the trial court to determine the propriety of sustaining the motion initially." ITT , 854 S.W.2d at 376.

The court also seems to have believed Billingsley lacked a requisite insurable interest because Joanna held record title in 1986 when Farmers first issued coverage and "public policy demands that the insured have an insurable interest in property both at the time of making the contract and at the time of loss." DeWitt v. Am. Family Mut. Ins. Co. , 667 S.W.2d 700, 704 (Mo. banc 1984). But the record shows that Farmers initially issued an annual policy, then renewed it each April at an updated premium. Having re-acquired title in 1992, Billingsley had an insurable interest for the entirety of each annual policy term thereafter, including the full policy term when the loss occurred. To the extent he remained a mortgagor, Billingsley arguably also had an insurable interest during Joanna's title ownership. See Kilpatrick v. Hartford Fire Ins. Co. , 701 S.W.2d 755, 758-59 (Mo. App. 1985).

The mortgagees' insurable interest and rights were independent of the named insured, so they had coverage even if Joanna did not. Travers , 34 S.W.3d at 161-62. But their rights remained subject to all policy terms and conditions not expressly waived by the mortgage clause. Id . at 164 n.4 ; see also Point 6 supra re Farmers' stated reasons for denying the mortgagees' claim.

"The American Rule on attorney fees requires parties to bear their own attorney fees unless there is statutory authorization or a contractual agreement for the fees or when special or unusual circumstances make an award of attorney fees necessary to equitably balance benefits." Beavers v. McGinnis , 277 S.W.3d 308, 310 (Mo. App. 2009).

"The collateral litigation exception to the American Rule allows a plaintiff to recover attorney fees that he expended in collateral litigation with a third party as a result of the defendant's wrongdoing." Beavers , 277 S.W.3d at 310.

Instruction 6 directed jurors to find for Farmers if they believed:
First, [Billingsley] intentionally filed a complaint with the Division of Consumer Affairs for the Department of Insurance against [Farmers], with actual intent to injure [Farmers] by compelling it to pay him coverage under a policy of insurance issued to his sister, Joanna Billingsley, and
Second, [Billingsley] acted with insufficient justification, and
Third, [Farmers] was thereby damaged.

Further references to this Restatement section or comment, here or in the concurring opinion, will be as "Restatement § 870" or "Comment _" respectively.

Although MAI 23.11 (tortious interference with contract) similarly hypothesizes that the defendant acted "without justification or excuse" without defining justification, that cause of action differs markedly from prima facie tort. " 'Without justification' has been defined, in the context of tortious interference with business relationships, as the absence of any legal right to take the actions that form the basis of the claim ," and no liability arises "if the defendant had an unqualified legal right to do the action of which the petition complains. " Vikings, USA Bootheel MO v. Modern Day Veterans , 33 S.W.3d 709, 711 (Mo. App. 2000) (my emphasis). By contrast, a prima-facie-tort defendant acts lawfully, presumably with "an unqualified legal right to do the action of which the petition complains" (id . ) and perhaps even with "justification," yet may still be liable if a factfinder deems that justification "insufficient."

Some 180 reported Missouri opinions since Porter (1980) have mentioned prima facie tort, and still "no case resulting in a verdict for the plaintiff has been affirmed by Missouri appellate courts." 34 Mo. Prac., Personal Injury and Torts Handbook § 37:1 (2017 ed.).